[No. S152934. Aug. 2, 2010.]

CORAL CONSTRUCTION, INC., Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Appellants.
SCHRAM CONSTRUCTION, INC., Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Appellants.

316

318

**COUNSEL**

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass, Danny Chou, Sherri Sokeland Kaiser and James M. Emery, Deputy City Attorneys; Moscone, Emblidge & Quadra, G. Scott Emblidge, Rachel J. Sater, Robert D. Sanford, Michael P. Brown; Meyers, Nave, Riback, Silver & Wilson, Mara E. Rosales, Joseph M. Quinn and K. Scott Dickey for Defendants and Appellants.

Lewis, Feinberg, Lee, Renaker & Jackson, Bill Lann Lee, Vincent Cheng and Lindsay Nako for Council of Asian American Business Associations, Association of Asian American Attorney and CPA Firms, Chinese for Affirmative Action, Asian American Justice Center, Asian Law Caucus and Asian American Bar Association of the Greater Bay Area as Amici Curiae on behalf of Defendants and Appellants.

Nancy Ramirez, Nicholas Espiritu; Sonnenschein Nath & Rosenthal, Christopher E. Prince, Shirin Soleman, Demian L. Pay and Manuel Alvarez, Jr., for Mexican American Legal Defense and Educational Fund as Amicus Curiae on behalf of Defendants and Appellants.

Bingham McCutchen, Michael Isaku Begert, Karen Lu, Rianne E. Nolan, Renee M. DuPree, Nancy M. Wang, Elizabeth M. Hall; Sujal J. Shah; Lawyers' Committee for Civil Rights and Oren Sellstrom for Coalition for Economic Equity as Amicus Curiae on behalf of Defendants and Appellants.

Frank C. Newman International Human Rights Clinic and Constance de la Vega as Amici Curiae on behalf of Defendants and Appellants.

Pacific Legal Foundation, John H. Findley, Sharon L. Browne, Alan W. Foutz and Paul J. Beard II for Plaintiffs and Respondents.

Gordon M. Fauth, Jr., and Michael J. Meyer for Asian American Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Respondents.

Law Office of Anthony T. Caso and Anthony T. Caso for American Civil Rights Institute as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**WERDEGAR, J.**—Article I, section 31 of the California Constitution (section 31) forbids a city awarding public contracts to discriminate or grant preferential treatment based on race or gender. (See generally *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (*Hi-Voltage*).) Here, a city whose public contracting laws expressly violate section 31 challenges its validity under the so-called political structure doctrine, a judicial interpretation of the federal equal protection clause. (U.S. Const., 14th Amend.; see generally *Washington v. Seattle School Dist. No. 1* (1982) 458 U.S. 457 [73 L.Ed.2d 896, 102 S.Ct. 3187] (*Seattle*) and *Hunter v. Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557] (*Hunter*).) We conclude section 31 does not violate the political structure doctrine.

### I. BACKGROUND

For the last 26 years, defendant City and County of San Francisco (City) has preferentially awarded public contracts to minority-owned business enterprises (MBE's) and women-owned business enterprises (WBE's). The City's Board of Supervisors (Board) has mandated these preferences in a series of ordinances adopted over time, justifying each with legislative findings purporting to show continuing discrimination by the City against MBE's and WBE's. The details of the program have evolved, partly in response to changes in the law governing the validity of such preferences. Plaintiffs Coral Construction, Inc. (Coral), and Schram Construction, Inc. (Schram), challenge the 2003 version of the ordinance[1] as unconstitutional under section 31.

The City's first MBE/WBE ordinance, adopted in 1984, set aside specified percentages of public contracting dollars for MBE's and WBE's. The ordinance also gave bid discounts, which required the City's contracting authorities to treat bids by MBE's and WBE's as if they were lower than they in fact were. Both the set-asides and the bid discounts afforded MBE's and WBE's a competitive advantage over other bidders.

In 1989, the United States Court of Appeals for the Ninth Circuit held the City's 1984 ordinance violated the federal equal protection clause (U.S.

---

[1] (Version V of "Minority/Women/Local Business Utilization Ordinance," S.F. Ord. No. 134-03 (approved June 1, 2003, expired June 30, 2008 [see fn. 4, *post*]) codified as S.F. Admin. Code, §§ 12D.A.1–12D.A.22.)

Const., 14th Amend.) in giving preferences based on race, and that it also violated the City's own charter in several respects. (*Associated General Contractors of California v. City & County of San Francisco* (9th Cir. 1987) 813 F.2d 922, 944.) Shortly thereafter, the United States Supreme Court determined that Richmond, Virginia's MBE set-asides violated equal protection. (*Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469, 498–506 [102 L.Ed.2d 854, 109 S.Ct. 706] (*Croson*).) The legislative findings supporting Richmond's program did not show the requisite " 'strong basis in evidence for [the city's] conclusion that remedial action was necessary.' " (*Id.*, at p. 500, quoting *Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 277 [90 L.Ed.2d 260, 106 S.Ct. 1842] (plur. opn. of Powell, J.).) Four justices suggested, however, that in "the extreme case" not presented in *Croson*, "some form of narrowly tailored racial preference might be necessary" as a remedy "to break down patterns of deliberate exclusion." (*Croson*, at p. 509 (plur. opn. of O'Connor, J.).)

Responding to these judicial decisions, San Francisco's Board in 1989 passed a new ordinance eliminating set-asides but retaining bid discounts and other preferences for MBE's and WBE's. When an organization of businesses sued to enjoin the ordinance's enforcement, the City argued the equal protection clause required preferences as a remedy for discrimination. The federal district court declined to issue interim relief because the plaintiffs had failed to demonstrate a sufficient likelihood of success on the merits. (*Associated General Contractors v. San Francisco* (N.D.Cal. 1990) 748 F.Supp. 1443, 1456.) The Ninth Circuit affirmed. (*Associated General Contractors of California v. Coalition* (9th Cir. 1991) 950 F.2d 1401, 1418.)

The voters approved Proposition 209 at the November 1996 general election, thus adding section 31 to article I of the state Constitution. Section 31 declares that the state, including its political subdivisions, "shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (§ 31, subd. (a).) The next year, the Ninth Circuit held section 31 did not violate the federal equal protection clause, as interpreted in the political structure cases (e.g., *Seattle, supra*, 458 U.S. 457 & *Hunter, supra*, 393 U.S. 385), and vacated a preliminary injunction against section 31's enforcement issued by the district court. (*Coalition for Economic Equity v. Wilson* (9th Cir. 1997) 122 F.3d 692, 711 (*Wilson*), vacating judg. in (N.D.Cal. 1996) 946 F.Supp. 1480.)

At the time the voters adopted section 31, the MBE/WBE ordinance then in effect was set to expire on October 31, 1998. Before the ordinance expired, the City's Board and its Human Rights Commission (HRC) conducted investigations for the stated purpose of "gaug[ing] the effectiveness of the

prior [MBE/WBE] Ordinances . . . and to assess the need for further and continuing action." (S.F. Admin. Code, former § 12D.A.2.)[2] The Board found that MBE's and WBE's were receiving a smaller share of City contracts than would be expected based on their availability, and that "[t]his poor utilization [could not] be attributed to chance" and was, instead, "due to discrimination by the City and discrimination in the private market." (S.F. Admin. Code, former § 12D.A.2.2.) In legislative findings setting out the basis for this conclusion, the Board cited its own statistical studies, similar studies by other governmental entities in the San Francisco Bay Area, testimony and oral histories recounting anecdotes of discrimination, "social science materials concerning discrimination against women and minorities in the Bay Area and in public contracting," and data showing that "the decision makers in the City contracting process—the City department heads and general and deputy managers—have been and continue to be overwhelmingly Caucasian males" operating under an " 'old boy network.' " (S.F. Admin. Code, former § 12.D.A.2 (findings 1, 15).)

Based on these findings, the Board in 1998 adopted a new ordinance preserving bid discounts for MBE's and WBE's, and requiring prime contractors either to use MBE and WBE subcontractors at levels set by the HRC or to make good faith efforts to do so through preferential outreach efforts targeted at such businesses. (S.F. Admin. Code, former §§ 12D.A.4, 12D.A.5, 12D.A.17.)

In 2000, while San Francisco's 1998 ordinance was still in effect, we held that section 31 invalidated the City of San Jose's public contracting program because it mandated participation goals for, and preferential outreach efforts directed to, MBE's and WBE's. (*Hi-Voltage*, *supra*, 24 Cal.4th 537, 562–565.) Section 31 does not tolerate, we explained, race- and gender-conscious preferences the equal protection clause does not *require* but merely *permits*. (See *Hi-Voltage*, at p. 567.) Like the plurality in *Croson*, *supra*, 488 U.S. 469, however, we held out the possibility that the federal equal protection clause might sometimes require race-conscious remedies to remedy intentional discrimination. (*Hi-Voltage*, at p. 568 ["Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury."]; see *Croson*, at p. 509 (plur. opn. of O'Connor, J.).)

In 2001, plaintiff Coral commenced the action now before us in the San Francisco Superior Court, seeking declaratory and injunctive relief against the

---

[2] Citations to "former" section 12D.A. of the San Francisco Administrative Code refer to version IV of the "Minority/Women/Local Business Utilization Ordinance" (S.F. Ord. No. 296-98, approved Oct. 5, 1998). All other citations to section 12D.A refer to version V of this ordinance (S.F. Ord. No. 134-03, approved June 1, 2003, expired June 30, 2008).

1998 ordinance. The ordinance was set to expire in 2003. (S.F. Admin. Code, former § 12D.A.21.) Before it expired, and while plaintiff's action proceeded in the superior court, the City conducted additional investigations to determine whether discrimination against MBE's and WBE's continued. Finding that such discrimination did continue, the Board in 2003 reenacted the 1998 ordinance without substantial change. (See S.F. Admin. Code, § 12D.A.2.8.) From that point on, the action proceeded as a challenge to the 2003 ordinance.

In legislative findings accompanying the 2003 ordinance, the Board once again relied on statistical studies showing that MBE's and WBE's were underutilized, both in San Francisco and the surrounding area, on testimony and oral histories recounting anecdotes of discrimination, and on social science materials. (S.F. Admin. Code, § 12D.A.2.) Based on this information, the Board found that "the race- and gender-conscious remedial programs authorized by [the MBE/WBE] Ordinance continue to be necessary to remedy discrimination against minority- and women-owned businesses in City prime contracting and subcontracting." (S.F. Admin. Code, § 12D.A.2.8.) The Board also found "that the City . . . is actively discriminating against women and minority groups in its contracting, and is passively participating in discrimination in the private sector." (*Ibid.*) In conclusion, the Board found "that the evidence before it establishes that the City's current contracting practices are in violation of federal law and that, as a result, [the] ordinance continues to be required by federal law to bring the City into compliance with federal civil rights laws in its contracting practices." (*Ibid.*)

More specifically, the Board found that "the following discriminatory practices [identified by the HRC in 1998 were still] at work in City contracting: (1) listing [MBE's and WBE's] as subcontractors but never using the listed [MBE and WBE] subcontracting firms, (2) the use of additional nonminority, male subcontractors never listed on the relevant HRC forms, and (3) the creation of fraudulent joint ventures involving minority- or women-owned and majority, men-owned firms." (S.F. Admin. Code, § 12D.A.2.7.) The Board also noted the HRC in 2003 "ha[d] encountered . . . additional discriminatory practices in City contracting," including: "(1) attempts by City personnel to improperly influence contract selection panels to ensure that MBEs/WBEs do not obtain City prime contracts; (2) attempts by City personnel to blame MBEs/WBEs unjustifiably for project delays; (3) the imposition of unnecessary minimum requirements on City contracts that act as a barrier to MBEs/WBEs; (4) the failure by City departments to submit draft requests for proposals to HRC with sufficient time to permit the HRC to ensure that adequate MBE/WBE subcontracting goals have been set; (5) attempts by City departments to circumvent the requirements of [the 1998] ordinance by extending or modifying existing contracts rather than putting new contracts out to bid; (6) the failure by City departments to

comply with the prompt payment provisions of this ordinance which ensure that MBEs/WBEs do not suffer unnecessary financial hardships; and (7) resistance by City prime contractors to provid[ing] the City with required subcontractor payment information, making it difficult for the City to ensure that MBE/WBE subcontractors receive prompt payment for their work on City contracts." (*Ibid.*)

The City's 2003 statistical studies showed that MBE's and WBE's continued "to receive a smaller share of certain types of contracts for the purchases of goods and services by the City than would be expected" based on their availability. (S.F. Admin. Code, § 12.D.A.2.3.) The studies also showed, however, that MBE's and WBE's received a larger share of other types of contracts. To note just a few examples, the City used African-American MBE's at 10 times, and WBE's at more than three times, the expected rate for professional services subcontracts, and used Latino MBE's at more than twice the expected rate for construction prime and subcontracts. (S.F. Admin. Code, §§ 12D.A.2.4, 12D.A.2.5.) The Board explained its overuse of MBE's and WBE's as "attributable to the fact that the City has remedial contracting programs in place," and found that to discontinue the use of preferences would cause MBE and WBE utilization rates to "plummet." (*Id.,* § 12D.A.2.4.) In comparison, non-MBE/WBE firms were slightly overused in most areas of City contracting, significantly overused in a few areas, and substantially overused only in prime contracts for architecture and engineering (by 40 percent) and prime and subcontracts for telecommunications (by 10 and 23 percent, respectively).

In contrast to 1998, the Board in 2003 no longer found that decision makers in the City's contracting process were overwhelmingly Caucasian males. (Compare S.F. Admin. Code, former § 12D.A.2.1 with *id.,* present § 12D.A.2 [deleting the prior finding].) The Board noted, however, that "[m]inorities and women [had] report[ed] that project managers in many City Departments continue to operate under an 'old boy network['] in awarding City prime contracts." (*Id.,* § 12D.A.2.6.)

The operative provisions of the 2003 ordinance give bid discounts that range from 5 to 10 percent, depending on the level of MBE/WBE participation. (S.F. Admin. Code, § 12D.A.9.2.) For each proposed prime contract, the director of the HRC sets MBE/WBE participation goals based on the availability of MBE/WBE subcontractors and the extent of subcontracting opportunities available. (*Id.,* § 12D.A.17(C).) Prospective prime contractors must demonstrate in their bids that they have made good-faith efforts to use MBE/WBE subcontractors, and must also identify the particular MBE/WBE subcontractors to be employed and the dollar value of their participation. (*Id.,* § 12D.A.17(D).) The director may waive the MBE/WBE subcontracting goals

only on a showing that subcontracting is infeasible given the project's requirements, that MBE/WBE subcontractors are unavailable, or that the available MBE's/WBE's "have given price quotes that exceed competitive levels beyond amounts that can be attributed to cover costs inflated by the present effects of discrimination." (*Id.*, § 12D.A.17(G)3; see also *id.*, § 12D.A.17(G)1, 2.) Bids that do not satisfy these requirements, or that do not meet the Director's MBE/WBE participation goals, "shall be declared nonresponsive." (*Id.*, § 12D.A.17(D).)

The 2003 ordinance defines "minority," and thus the groups whose businesses are entitled to be certified as MBE's, to include "African Americans (defined as persons whose ancestry is from any of the Black racial groups of Africa or the Caribbean); Arab Americans (defined as persons whose ancestry is from an Arabic speaking country that is a current or former member of the League of Arab States); Asian Americans (defined as persons with Chinese, Japanese, Korean, Pacific Islander, Samoan, Filipino, Asian Indian, and Southeast Asian ancestry); Iranian Americans (defined as persons whose ancestry is from the country of Iran); Latino Americans (defined as persons with Mexican, Puerto Rican, Cuban, Central American or South American ancestry[; p]ersons with European Spanish ancestry are not included as Latino Americans . . .); and Native Americans (defined as any person whose ancestry is from any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition[)]." (S.F. Admin. Code, § 12D.A.5.)

Finally, the 2003 ordinance declares as a matter of policy that "[t]he City will continue to rely on the relationship between the percentages of MBEs/WBEs in the relevant sector of the San Francisco business community and their respective shares of City contract dollars as a measure of the effectiveness of this ordinance in remedying the effects of the aforementioned discrimination." (S.F. Admin. Code, § 12D.A.3.)

After the City adopted the 2003 ordinance, plaintiff Schram commenced a separate action challenging its validity under section 31 and seeking declaratory and injunctive relief. Schram and the City filed cross-motions for summary judgment. When briefing on the motions in *Shram* was complete, the parties to *Coral* joined in the motions, and all parties in both cases stipulated that no further briefing or record submissions would be necessary to permit the court to issue rulings on summary judgment in both cases. In view of the stipulation, the superior court consolidated *Shram* and *Coral* for all purposes.

The superior court granted plaintiffs' motion and denied the City's. Relying on *Hi-Voltage, supra*, 24 Cal.4th 537, the court held the 2003 ordinance

violated section 31. Relying on the Ninth Circuit's decision in *Wilson, supra*, 122 F.3d 692, the court held section 31 did not violate the political structure doctrine. Finally, the court concluded the ordinance was not required to avoid a loss of federal funds and was, thus, not exempt from section 31 on that basis. (See § 31, subd. (e).)[3] As relief, the court entered a permanent injunction prohibiting the City from enforcing the 2003 ordinance or any similar program in the future. The Court of Appeal affirmed in part, reversed in part, and remanded for adjudication of the City's claim that the federal equal protection clause required the ordinance. We granted review.[4]

## II. Discussion

### A. *The Political Structure Doctrine.*

We first address the City's argument that section 31 violates the political structure doctrine—an aspect of federal equal protection articulated in *Seattle, supra*, 458 U.S. 457, and *Hunter, supra*, 393 U.S. 385. The City raised this issue in its cross-motion for summary judgment as a ground for judgment in its favor. Accordingly, the City's burden is to show "that there is no triable issue as to any material fact and that [it] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review the matter de novo because it comes to us as a ruling on a motion for summary judgment. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67–68 [99 Cal.Rptr.2d 316, 5 P.3d 874].) We requested briefing on the issue,[5] and now hold that section 31 does not violate equal protection.

■ To determine whether California's section 31 is consistent with the federal equal protection clause (U.S. Const., 14th Amend.) we must first make clear what the state provision means. As the Legislative Analyst explained in the official ballot pamphlet presenting the proposed measure to the voters, section 31 was intended to "eliminate state and local government affirmative action programs in the areas of public employment, public

---

[3] "Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State." (§ 31, subd. (e).)

[4] The 2003 ordinance expired by its own terms on June 30, 2008. (S.F. Admin. Code, § 12D.A.22.) The case is not therefore moot, however, because the injunction bars the City from adopting any similar ordinance in the future, and because there is no reason to believe the City would not, but for the injunction, renew its long-standing mandate for race- and gender-based preferences. In any event, no party has asked us to dismiss review.

[5] Specifically, we asked whether "article I, section 31, of the California Constitution, which prohibits government entities from discrimination or preference on the basis of race, sex, or color in public contracting, improperly disadvantage[s] minority groups and violates equal protection principles by making it more difficult to enact legislation on their behalf[.] (See [*Seattle, supra,*] 458 U.S. 457; [*Hunter, supra,*] 393 U.S. 385.)"

education, and public contracting to the extent these programs involve 'preferential treatment' based on race, sex, color, ethnicity, or national origin. The specific programs affected by the measure, however, . . . depend on such factors as (1) court rulings on what types of activities are considered 'preferential treatment'[6] and (2) whether federal law requires the continuation of certain programs." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 209 by Legis. Analyst, p. 30.) Section 31's ban on preferences includes certain exceptions. The provision does not affect "bona fide qualifications based on sex" (§ 31, subd. (c)), existing court orders or consent decrees (*id.*, subd. (d)), and actions which must be taken to avoid a loss of federal funds to the state (*id.*, subd. (e)). (See Ballot Pamp., *supra*, analysis of Prop. 209, p. 30.)

■ Most importantly for present purposes, section 31 prohibits race- and gender-conscious programs the federal equal protection clause *permits* but does not *require*. As we explained in *Hi-Voltage, supra*, 24 Cal.4th 537, 567, "[e]qual protection allows discrimination and preferential treatment whenever a court determines they are justified by a compelling state interest and are narrowly tailored to address an identified remedial need." In contrast, "section 31 categorically prohibits discrimination and preferential treatment. Its literal language admits no 'compelling state interest' exception [and] we find nothing to suggest the voters intended to include one sub silentio." (*Ibid.*) Section 31 poses no obstacle, however, to race- or gender-conscious measures *required* by federal law or the federal Constitution. This is the inescapable effect of the supremacy clause (U.S. Const., art. VI, cl. 2), which section 31 implicitly acknowledges in a savings clause.[7]

Addressing an identical challenge to section 31, the Ninth Circuit in *Wilson, supra*, 122 F.3d 692, 701, observed that, "[a]s a matter of 'conventional' equal protection analysis, there is simply no doubt that [section 31] is constitutional." The clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) "A core purpose" of the clause is to "do away with all governmentally imposed discrimination based on race" (*Palmore v. Sidoti*

---

[6] In *Hi-Voltage, supra*, 24 Cal.4th 537, we concluded that section 31 uses the terms "discrimination" and "preferential treatment" in their " 'natural and ordinary meaning[s] . . . .' " (*Hi-Voltage*, at p. 559, quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Thus, to " '[d]iscriminate' means 'to make distinctions in treatment; show partiality (*in favor of*) or prejudice (*against*),' " and " 'preferential' means giving 'preference,' which is 'a giving of priority or advantage to one person . . . over others.' " (*Hi-Voltage*, at pp. 559–560, quoting Webster's New World Dict. (3d college ed. 1988) pp. 392, 1062.)

[7] "If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit." (§ 31, subd. (h) [in relevant part].)

(1984) 466 U.S. 429, 432 [80 L.Ed.2d 421, 104 S.Ct. 1879], fn. omitted), thus ultimately helping to create "a political system in which race no longer matters" (*Shaw v. Reno* (1993) 509 U.S. 630, 657 [125 L.Ed.2d 511, 113 S.Ct. 2816]). To further this goal, the clause renders racial classifications presumptively invalid, regardless of purported motivation (*Nevada Dept. of Human Resources v. Hibbs* (2003) 538 U.S. 721, 736 [155 L.Ed.2d 953, 123 S.Ct. 1972]; *Personnel Administrator of Mass. v. Feeney* (1979) 442 U.S. 256, 272 [60 L.Ed.2d 870, 99 S.Ct. 2282]), and tolerates them only when narrowly tailored to serve compelling governmental interests (*Adarand Constructors, Inc. v. Pena* (1995) 515 U.S. 200, 224, 226–227 [132 L.Ed.2d 158, 115 S.Ct. 2097] (*Adarand*)). Section 31 is consistent with equal protection, under this analysis, because "[a] law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender" (*Wilson*, at p. 702), and because the federal Constitution does not oblige the state to permit racial classifications the federal Constitution itself does not require. "That the Constitution *permits* the rare race-based or gender-based preference hardly implies that the state cannot ban them altogether." (*Wilson*, at p. 708.)

To argue that section 31 violates equal protection, the City invokes the rarely used political structure doctrine. The doctrine has its origin in *Hunter, supra*, 393 U.S. 385, and *Seattle, supra*, 458 U.S. 457, and its parameters necessarily emerge from those decisions.

In *Hunter, supra*, 393 U.S. 385, a realtor in Akron, Ohio, refused to show homes to an African-American prospective buyer. When the buyer sued to compel the city to enforce its fair housing ordinance, the city's voters repealed the ordinance and amended the city charter to require a referendum before any new ordinance on the same subject could take effect. (*Id.*, at pp. 386–387.) The high court held the charter amendment violated equal protection. While the provision "declare[d] no right to discriminate in housing" (*id.*, at p. 389), it still contained "an explicitly racial classification," in the sense that it "treat[ed] racial housing matters differently from other racial and housing matters" (*ibid.*). "The automatic referendum system [did] not," for example, "reach housing discrimination on sexual or political grounds, or against those with children or dogs, nor [did] it affect tenants seeking more heat or better maintenance from landlords, nor those seeking rent control, urban renewal, public housing, or new building codes." (*Id.*, at p. 391.) The referendum system placed a burden only on the minority, the court explained, because "[t]he majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." (*Ibid.*) While the city might properly have changed the existing ordinance by "majority vote at [a] town meeting" (*id.*, at p. 392), the city "instead chose[] a more complex system. Having done so," the court concluded, "the [city] may no more disadvantage any particular group by making it more difficult to enact

legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." (*Id.*, at pp. 392–393.)

In *Seattle, supra*, 458 U.S. 457, the governing board of a Washington public school district voluntarily adopted a plan to end de facto racial segregation by busing pupils to reduce racial imbalance in individual schools. (*Id.*, at pp. 460–461.) The state's voters responded by amending the state's constitution to prohibit busing for the purpose of desegregation, while still allowing busing for most of the other reasons for which pupils were already being transported (e.g., to provide special education and reduce overcrowding). (*Id.*, at pp. 461–463, 471.) Relying on *Hunter, supra*, 393 U.S. 385, the high court held the state constitutional provision violated equal protection. The state provision, the court explained, "remove[d] the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." (*Seattle*, at p. 474.) The provision burdened minority interests by "lodging decisionmaking authority over the question at a new and remote level of government." (*Id.*, at p. 483.) As a result, "[t]hose favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate," while "authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board." (*Id.*, at p. 474.)

■ The "political structure" doctrine that emerges from these decisions is perhaps best summarized in the *Seattle* majority's statement that "the Fourteenth Amendment . . . reaches 'a political structure that treats all individuals as equals,' . . . yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." (*Seattle, supra*, 458 U.S. 457, 467, citation omitted, quoting *Mobile v. Bolden* (1980) 446 U.S. 55, 84 [64 L.Ed.2d 47, 100 S.Ct. 1490] (conc. opn. of Stevens, J.).) The City argues this doctrine straightforwardly invalidates section 31 because that provision uses the racial (or gender-based) nature of an issue (i.e., preferences) to structure governmental decisionmaking, in the sense that groups that seek race- or gender-based preferences in public contracting, employment and education must first overcome the obstacle of amending the state Constitution, while groups that seek preferences on other bases (e.g., disability or veteran status) need not.
■ Although superficially appealing, the City's argument is not ultimately persuasive. The United States Courts of Appeals for the Sixth and Ninth Circuits have concluded the political structure doctrine does not invalidate state laws that broadly forbid preferences and discrimination based on race, gender and other similar classifications. (See *Wilson, supra*, 122 F.3d 692, 708–709; *Coalition to Defend Affirmative Action v. Granholm* (6th Cir. 2006) 473 F.3d 237, 251 (*Granholm*).) ■ While the lower federal courts'

decisions do not bind us, we give them "great weight" when they reflect a consensus, as they do here. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58 [51 Cal.Rptr.3d 55, 146 P.3d 510]; *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320–321 [93 Cal.Rptr.2d 36, 993 P.2d 366].) Here, exercising our independent judgment on the matter, we conclude the Sixth and Ninth Circuits' decisions are correct on this point.

In *Wilson, supra,* 122 F.3d 692, as previously noted, the Ninth Circuit rejected the City's argument that section 31 violates the political structure doctrine—the same argument the City now repeats in this court. In rejecting the argument, the Ninth Circuit observed that "[i]mpediments to preferential treatment do not deny equal protection. It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment. While the [federal] Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms." (*Wilson,* at p. 708, fn. omitted.) "That the Constitution *permits* the rare race-based or gender-based preference hardly implies that the state cannot ban them altogether." (*Ibid.*) The Sixth Circuit in *Granholm* relied in part on the same reasoning in declining to issue preliminary injunctive relief against a provision of the Michigan Constitution (*id.,* art. I, § 26) identical to California's section 31. (*Granholm, supra,* 473 F.3d 237, 251 [impediments to preferential treatment do not deny equal protection (citing *Wilson,* at p. 708)].)[8]

The City perceives no important difference between initiatives obstructing equal treatment and initiatives banning preferences, describing both as "plac-[ing] special burdens on the ability of minority groups to achieve beneficial legislation." (*Seattle, supra,* 458 U.S. 457, 467.) We do not think, however, that the term "beneficial legislation" can bear the weight the City would place upon it. Nothing in *Hunter, supra,* 393 U.S. 385, or *Seattle* supports extending the political structure doctrine to protect race- or gender-based preferences that equal protection does not require.

The ordinance repealed by Akron's voters in *Hunter, supra,* 393 U.S. 385, merely required equal treatment in the sale and lease of real property. (See *id.,* at p. 386.) The initiative repealing the ordinance had no apparent consequence but to perpetuate the unequal treatment of minorities by depriving them of the benefit of plainly constitutional legislation. (Cf. *Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], affg. *Mulkey v. Reitman*

---

[8] (See also *Coalition to Defend Affirmative Action v. Regents of University of Michigan* (E.D.Mich. 2008) 539 F.Supp.2d 924, 953–958 [dismissing action]; *Coalition v. Regents of University of Michigan* (E.D.Mich. 2008) 592 F.Supp.2d 948, 950–952 [denying motion to alter or amend judgment].)

(1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825].) In no sense did the case concern preferences, and it therefore offers the City's position no support.

■ Relying instead on *Seattle, supra,* 458 U.S. 457, the City contends the local pupil transportation programs involved in that case were "designed to move many students from schools nearest their homes in order to address 'racial imbalances' in the schools [and thus] can only be described as providing affirmative, race-conscious relief." This characterization of *Seattle* is accurate, but only so far as it goes. In arguing that *Seattle* protects presumptively unconstitutional racial preferences, the City reads the decision without regard to its historical context and thus unjustifiably extends its holding. Today the race-conscious pupil assignment programs repealed by Washington's voters would be presumptively unconstitutional and, thus, subject to strict scrutiny. (See *Parents Involved in Community Schools v. Seattle School Dist. No. 1* (2007) 551 U.S. 701, 720 [168 L.Ed.2d 508, 127 S.Ct. 2738] *(Parents Involved).*) But at the time *Seattle* was decided, the high court's prior decisions indicated that the assignment of pupils by ratios to achieve racial balance fell "within the broad discretionary powers of school authorities" to formulate "educational policy" and to "prepare students to live in a pluralistic society . . . ." (*Swann v. Board of Education* (1971) 402 U.S. 1, 16 [28 L.Ed.2d 554, 91 S.Ct. 1267]; see also *Board of Education v. Swann* (1971) 402 U.S. 43, 45 [28 L.Ed.2d 586, 91 S.Ct. 1284].) Although the dissent in *Seattle* argued that race-conscious pupil-assignment policies were "presumptively invalid" and required an "extraordinary justification" (see *Seattle,* at p. 492, fn. 6 (dis. opn. of Powell, J.)), the majority did not address the argument.[9] Nor does anything in *Seattle* suggest the high court understood the pupil assignment policies in question as providing unequal *preferences*, as opposed simply to " '*equal* educational opportunity' " (*Seattle,* at p. 479, italics added, quoting *Citizens Against Mandatory Bussing v. Palmason* (1972) 80 Wn.2d 445 [495 P.2d 657, 663]) in the plain, immediate sense of sending pupils of different races to the same schools. Accordingly, *Seattle* cannot fairly be read as holding that the political structure doctrine protects presumptively unconstitutional racial preferences, as opposed to programs intended to bring about immediate equal treatment. "Even a state law that

---

[9] The majority in *Seattle, supra,* 458 U.S. 457, noted the litigants had "not challenge[d] the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior *de jure* segregation." (*Id.,* at p. 472, fn. 15, citing *Swann v. Board of Education, supra,* 402 U.S. 1, 16, and *Board of Education v. Swann, supra,* 402 U.S. 43, 45.) The court "therefore [did] not specifically pass on that issue." (*Seattle,* at p. 472, fn. 15.)

does restructure the political process can only deny equal protection if it burdens an individual's right to equal treatment." (*Wilson, supra*, 122 F.3d 692, 707.)[10]

■ Instead of burdening the right to equal treatment, section 31 directly serves the principle that "all governmental use of race must have a logical end point." (*Grutter v. Bollinger* (2003) 539 U.S. 306, 342 [156 L.Ed.2d 304, 123 S.Ct. 2325]; see also *Parents Involved, supra*, 551 U.S 701, 760.) As noted, a "core purpose" of the equal protection clause is to "do away with all governmentally imposed discrimination based on race" (*Palmore v. Sidoti, supra*, 466 U.S. 429, 432, fn. omitted), ultimately creating "a political system in which race no longer matters" (*Shaw v. Reno, supra*, 509 U.S. 630, 657).

■ Racial preferences are presumptively unconstitutional (*Nevada Dept. of Human Res. v. Hibbs, supra*, 538 U.S. 721, 736) and tolerated only when narrowly tailored to serve compelling governmental interests (*Adarand, supra*, 515 U.S. 200, 224, 226–227). The requirement that such preferences withstand strict scrutiny "reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle." (*Grutter v. Bollinger, supra*, at p. 342.)[11] Accordingly, even in the rare case in which racial preferences are required by equal protection as a remedy for discrimination, the governmental body adopting such remedies must undertake an extraordinary burden of justification "to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." (*Croson, supra*, 488 U.S. 469, 510.) In contrast, a generally applicable rule forbidding preferences and discrimination not required by equal protection, such as section 31, does not logically require the same justification.[12]

■ For all of these reasons, we conclude the political structure doctrine does not invalidate section 31.

---

[10] We do not in any way question the political structure doctrine's continuing validity, despite suggestions to the contrary. (E.g., conc. & dis. opn. of Moreno, J., *post*, at pp. 342, 366–367.) Instead, we merely read *Seattle, supra*, 458 U.S. 457, in its historical context to determine how far its holding extends, as we must.

[11] The high court in *Grutter v. Bollinger, supra*, 539 U.S. 306, 337, rejected an equal protection challenge to a law school admissions policy that used race, without preferential quotas, as one factor "in a highly individualized, holistic review of each applicant's file . . . ." In its decision, the court noted that states "can and should draw on the most promising aspects of . . . race-neutral alternatives as they develop" in states such as "California . . . , where racial preferences in admissions are prohibited by state law [e.g., section 31] . . . ." (*Id.*, at p. 342.)

[12] Again, section 31 does not affect preferences required by the federal equal protection clause. (See § 31, subd. (h); see, *ante*, at p. 327.)

## B. *The Federal Funding Exception.*

The City next contends the 2003 ordinance is unaffected by section 31 because the ordinance falls within the exception set out in subdivision (e): "Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State." (§ 31, subd. (e).) The City, which receives federal funds for a variety of projects, argues it is compelled to enforce the 2003 ordinance by specific federal regulations imposing affirmative action obligations on cities that receive funds. We asked the parties to brief the issue[13] and now hold, as did the lower courts, that the City's argument lacks merit.

The City invokes the federal funding exception (§ 31, subd. (e)) not as a basis for its own motion for summary judgment but, rather, as an argument against plaintiffs' motion. Accordingly, the City's burden is to show that a triable issue of fact exists. (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The superior court did not mention the federal funding argument in its written ruling granting plaintiffs' motion. The Court of Appeal, however, discussed and rejected the argument, concluding that the relevant federal regulations do not require racial preferences and that the City has not, in any event, made a sufficient factual showing of past discrimination to trigger any obligation under the regulations. Of these two grounds, we find the first dispositive and thus do not reach the second.[14]

The City's argument begins with the Civil Rights Act of 1964 (Pub.L. No. 888-352 (July 2, 1964) 78 Stat. 241), title VI, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d.) Title VI also authorizes and directs "[e]ach Federal department and agency which is empowered to extend

---

[13] Specifically, we asked the parties whether "an ordinance that provides certain advantages to minority- and female-owned business enterprises with respect to the award of city contracts fall[s] within an exception to section 31 for actions required of a local government entity to maintain eligibility for federal funds under the federal Civil Rights Act (42 U.S.C. § 2000d) . . . ."

[14] Accordingly, our analysis and disposition of this issue do not depend on whether the City on remand proves, or fails to prove, that it has purposefully discriminated against MBE's and WBE's. (See, *post*, at p. 335 et seq.) We address here only the question whether the relevant federal regulations, independently of the federal equal protection clause (U.S. Const., 14th Amend.), require the 2003 ordinance. If the federal equal protection clause *itself* requires the 2003 ordinance, then the City's claim under the federal regulations has no practical significance.

Federal financial assistance to any program or activity . . . to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with [the] achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." (42 U.S.C. § 2000d-1.) Exercising this rulemaking authority, the Environmental Protection Agency and the Secretary of Transportation have issued regulations forbidding discrimination in the projects they fund and requiring "affirmative action" in specified circumstances. (40 C.F.R. § 7.35(a)(7) (2010) [environmental protection];[15] 49 C.F.R. § 21.5(b)(7) (2009) [transportation].[16]) In neither regulation, however, is the term "affirmative action" defined. (Cf. 40 C.F.R. § 7.25 (2010) [environmental protection; definitions]; 49 C.F.R. § 21.23 (2009) [transportation; definitions].)

 The City contends these regulations compelled it to adopt the 2003 ordinance to avoid a loss of federal funding. We do not agree. Although the regulations use the broad, undefined term "affirmative action," no intention to require racial preferences emerges from their plain language. The Environmental Protection Agency's regulation requires a recipient of federal funds who has "previously discriminated" to "take affirmative action to provide remedies *to those who have been injured by the discrimination*." (40 C.F.R. § 7.35(a)(7) (2010), italics added.) In this context, the term "affirmative action" clearly refers not to race-based remedies but, rather, to actions taken to benefit the specific victims of past discrimination. The regulation thus cannot logically mandate an ordinance like the City's, which confers preferences on bidders based on race without regard to specific instances of past discrimination. The Secretary of Transportation's regulation more broadly requires the recipients of federal funds to take "affirmative action to assure that no person is excluded from participation" in

---

[15] "In administering a program or activity receiving Federal financial assistance in which the recipient has previously discriminated on the basis of race, color, sex, or national origin, the recipient shall take affirmative action to provide remedies to those who have been injured by the discrimination." (40 C.F.R. § 7.35(a)(7) (2010).)

[16] "This part does not prohibit the consideration of race, color, or national origin if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. Where prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this part applies, the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage. Even in the absence of prior discriminatory practice or usage, a recipient in administering a program or activity to which this part applies, is expected to take affirmative action to assure that no person is excluded from participation in or denied the benefits of the program or activity on the grounds of race, color, or national origin." (49 C.F.R. § 21.5(b)(7) (2009).)

a federally funded program "[e]ven in the absence of prior discriminatory practice or usage . . . ." (49 C.F.R. § 21.5(b)(7) (2009).) The regulation also mentions race-based remedies but is on this point expressly permissive, stating that it *"does not prohibit the consideration of race . . . to . . .* overcome the consequences" of past discrimination. (*Ibid.*, italics added.) The unmistakable import of this language is not that race-based remedies are required, but simply that they are permitted, so far as the Secretary is concerned, if no other law precludes them. That the Secretary has no objection to race-based remedies does not establish the federal compulsion required to exempt the City's 2003 ordinance from section 31.

For these reasons, we find no merit in the argument that the federal funding exception (§ 31, subd. (e)) exempts the 2003 ordinance from section 31's general prohibition of racial preferences. No triable issue of fact exists on this point to preclude summary judgment for plaintiffs.

### C. *The Federal Compulsion Argument.*

Finally, the City contends the federal equal protection clause (U.S. Const., 14th Amend.) requires the 2003 ordinance as a remedy for the City's own discrimination. Although the superior court granted summary judgment for plaintiffs, the court did not meaningfully address the City's federal compulsion argument. The Court of Appeal reversed the superior court's decision to this extent and remanded the case "for the limited purpose of adjudicating this issue." Plaintiffs petitioned for review, and we directed the parties to brief the question.[17] We hold the Court of Appeal ruled correctly and affirm its judgment remanding for further proceedings.

Plaintiffs assert two procedural objections to remanding for further proceedings. Both lack merit. First, plaintiffs suggest the City failed to carry its burden in the superior court and is merely seeking a second, undeserved chance to do so. Plaintiffs mischaracterize the procedural posture. Because the City raised the federal compulsion theory as an argument against plaintiffs' motion for summary judgment, the City's burden was to show that triable issues of fact exist. (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th 826, 849.) All parties have stipulated that no additional briefing or record submissions are necessary; the City seeks only a hearing in the superior court to determine whether it has carried its burden. Second, plaintiffs contend the City did not properly plead its federal compulsion theory. To the extent the City was required to plead the theory,

---

[17] Specifically, we asked whether "the Court of Appeal properly remand[ed] the case to the trial court to determine in the first instance whether the ordinance was required by the federal equal protection clause as a narrowly tailored remedial program to remedy ongoing, pervasive discrimination in public contracting . . . ."

the City did so by alleging in its answer as an affirmative defense that plaintiff Schram's complaint "is barred on the ground that the federal Constitution preempts the application of Proposition 209 [i.e., section 31] to invalidate the Ordinance." Plaintiffs never objected in the lower courts that the City's pleading was insufficient to preserve the issue. Instead, plaintiffs responded on the merits, thus waiving the objection. (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 346, fn. 5 [87 Cal.Rptr.2d 856].)

 Certainly we have the power to decide the federal compulsion issue in the first instance. We owe the superior court no deference in reviewing its ruling on a motion for summary judgment; the standard of review is de novo. (*Johnson v. City of Loma Linda, supra,* 24 Cal.4th 61, 67–68.) Furthermore, "[i]t is axiomatic that we review the trial court's rulings and not its reasoning." (*People v. Mason* (1991) 52 Cal.3d 909, 944 [277 Cal.Rptr. 166, 802 P.2d 950].) Thus, a reviewing court may affirm a trial court's decision granting summary judgment for an erroneous reason. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19 [112 Cal.Rptr. 786, 520 P.2d 10].) In this case, however, we see no detriment and some benefit in affording the City the hearing in the superior court to which all litigants are entitled as a matter of course. (Code Civ. Proc., § 437c, subd. (a).) Unlike the political structure and federal funding issues, which we may resolve as questions of law, the federal compulsion claim is largely factual and depends on the evidence supporting the Board's decision to adopt race-conscious legislation. When the government seeks to defend actions based on race as remedial, there must be "a 'strong basis in evidence for its conclusion that remedial action was necessary.' " (*Croson, supra,* 488 U.S. 469, 500; quoting *Wygant v. Jackson Board of Education, supra,* 476 U.S. 267, 277 (plur. opn. of Powell, J.).) We expect the superior court's assessment of the record will assist the reviewing courts, if necessary, in determining whether a strong basis in the evidence does in fact support the City's decision to adopt the 2003 ordinance.[18]

---

[18] One remaining procedural issue lies uniquely within the superior court's knowledge. The parties disagree on whether or not the City's responses to plaintiff Coral's requests for admission are properly part of the record for purposes of summary judgment. The answer depends on how one interprets the parties' stipulation concerning the record—a stipulation solicited and approved by the superior court. (See, *ante,* at p. 325.)

The City's admissions have possible significance, as they appear to concede, subject to certain objections and qualifications: (1) that since at least April 2, 1984, it has not been a policy of the City to discriminate against MBE's or WBE's; (2) that the City cannot identify a specific contract on which a prime contractor discriminated against an MBE or WBE subcontractor after November 5, 1996, where the MBE or WBE was the lowest responsive bidder; and (3) that the City has not identified any specific contract-awarding authority which discriminated against an MBE or WBE in the awarding of one of the City's public contracts after November 5, 1996. The superior court on remand should determine whether the City's

We offer the following comments to assist the superior court in resolving the federal compulsion issue on remand: While the parties have not brought to our attention any decision ordering a governmental entity to adopt race-conscious public contracting policies under the compulsion of the federal equal protection clause, the relevant decisions hold open the possibility that race-conscious measures might be required as a remedy for purposeful discrimination in public contracting. (*Hi-Voltage, supra*, 24 Cal.4th 537, 568 ["Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury."]; see also *Croson, supra*, 488 U.S. 469, 509 (plur. opn. of O'Connor, J.) ["In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion."].)

██ All racial classifications, even those contained in ostensibly remedial laws, must survive strict scrutiny. (*Parents Involved, supra*, 551 U.S. 701, 720; *Adarand, supra*, 515 U.S. 200, 226–227.) This is because " ' "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." ' " (*Parents Involved*, at p. 720, quoting *Gratz v. Bollinger* (2003) 539 U.S. 244, 270 [156 L.Ed.2d 257, 123 S.Ct. 2411].) Under the strict scrutiny test, "such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." (*Adarand*, at p. 227.) The only possibly compelling governmental interest implicated by the facts of this case is the interest in providing a remedy for purposeful discrimination. (See *Croson, supra*, 488 U.S. 469, 500; see also *id.*, at p. 509 (plur. opn. of O'Connor, J.); *Hi-Voltage, supra*, 24 Cal.4th 537, 568.)[19] ██ In any event, proof of discriminatory purpose or intent is always required to show a violation of the federal equal protection clause (*Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 265 [50 L.Ed.2d 450, 97 S.Ct. 555]), and remedial action must actually be necessary (*Croson*, at p. 500).

Accordingly, to defeat plaintiffs' motion for summary judgment, the City must show that triable issues of fact exist on each of the factual predicates for its federal compulsion claim, namely (1) that the City has purposefully or intentionally discriminated against MBE's and WBE's; (2) that the purpose of the City's 2003 ordinance is to provide a remedy for such discrimination; (3) that the ordinance is narrowly tailored to achieve that purpose; and

admissions are properly part of the record for summary judgment, as defined by the parties' stipulation, and, if so, the admissions' bearing on the question of whether triable issues of fact exist.

[19] In contrast, outright racial balancing is "patently unconstitutional" and not a compelling state interest that can properly justify racial classifications. (*Grutter v. Bollinger, supra*, 539 U.S. 306, 330; see also, e.g., *Parents Involved, supra*, 551 U.S. 701, 730; cf. *Croson, supra*, 488 U.S. 469, 507–508.)

(4) that a race- and gender-conscious remedy is necessary as the only, or at least the most likely, means of rectifying the resulting injury. If any of these points can be resolved as a matter of law in plaintiffs' favor, it follows that the City cannot establish federal compulsion and that plaintiffs are entitled to summary judgment.[20]

On remand, the superior court is to consider the federal compulsion issue based on the existing record in accordance with the "Stipulation of All Counsel That No Additional Briefing or Record Submissions Are Required for Consolidation" (July 9, 2004).

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur fully in the judgment affirming the Court of Appeal's decision. I write separately to set out an alternative ground for distinguishing the "political structure" cases, particularly *Washington v. Seattle School Dist. No. 1* (1982) 458 U.S. 457 [73 L.Ed.2d 896, 102 S.Ct. 3187] (*Seattle*), where the high court gave its broadest explanation of that equal protection doctrine. As the majority opinion explains, the *Seattle* court held that a statewide initiative measure prohibiting busing for the purpose of

---

[20] We note the Board's legislative findings on these points do not bind the court on remand. Although "[t]he factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary" (*Croson, supra*, 488 U.S. 469, 500), "[r]acial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice" (*ibid.*). "The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." (*Id.*, at p. 501.)

A legislative body cannot preclude searching judicial review of presumptively unconstitutional racial classifications with findings to the effect that such classifications are necessary, however much supporting evidence is claimed to exist. Certainly a legislative body must have a strong basis in evidence for determining that race-conscious remedial action is necessary (see *Croson, supra*, 488 U.S. 469, 500), and "evidence which would support a judicial finding of intentional discrimination may suffice also to justify remedial legislative action . . . ," even before a court has ordered it (*id.*, at p. 519 (conc. opn. of Kennedy, J.)). (Cf. conc. & dis. opn. of Moreno, J., *post*, at p. 369.) But to say that a legislative body can and must act on appropriate evidence does not mean that legislative findings constrain judicial review. The high court's decision in *Croson* is precisely to the contrary, and our decisions are in accord: " ' "[T]he deference afforded to legislative findings does 'not foreclose [a court's] independent judgment on the facts bearing on an issue of constitutional law.' " ' " (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 350 [66 Cal.Rptr.2d 210, 940 P.2d 797], quoting *Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473]; see also *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119].)

school integration violated the equal protection clause by singling out this racial issue and removing it from local control, "requir[ing] those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action." (*Seattle*, at p. 474; see maj. opn., *ante*, at p. 329.)

Here, the City and County of San Francisco (City) contends that article I, section 31 of the California Constitution (section 31) similarly burdens minority interests, by imposing a statewide ban on racial or gender preferences in public contracting. The majority opinion reasons that the busing program at issue in *Seattle* was understood by the court in terms of equal educational opportunity, not racial preferences. Therefore, the majority concludes, *Seattle*'s holding does not extend to racial preferences, which are presumptively unconstitutional under subsequent United States Supreme Court decisions. (Maj. opn., *ante*, at pp. 330–332.)

I am not sure this distinction goes far enough. Affirmative action programs always purport to ensure equal opportunity. The City may fairly claim that its contracting ordinance is meant to provide minority businesses with equal access to City contracts. (See maj. opn., *ante*, at pp. 323–325.) Conceivably, it could rewrite the ordinance to avoid any mention of preferences, yet awards of public contracts to minority businesses in the name of equal opportunity would be no less burdensome to other businesses that lost contracts as a result.[1] Whether a government benefit is awarded on the basis of a "preference" or a requirement of "equal treatment" is largely a matter of semantics.

I am, however, convinced that *Seattle* does not apply in this case for additional reasons. The *Seattle* court made it plain that it was most concerned about the anti-busing initiative's narrow focus on the racial aspect of school assignments: "[W]hen the political process or the decisionmaking mechanism used to address racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the governmental action plainly 'rests on "distinctions based on race." ' [Fn. omitted.] *James* v. *Valtierra* [(1971)] 402 U.S. [137,] 141 [28 L.Ed.2d 678, 91 S.Ct. 1331], quoting *Hunter* v. *Erickson* [(1969)] 393 U.S., [385,] 391 [21 L.Ed.2d 616, 89 S.Ct. 557]. And when the State's allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the 'special condition' of prejudice, the governmental action seriously 'curtail[s] the operation of those political processes ordinarily to be

---

[1] As the high court has observed in the equal protection context, "[t]he principle that racial balancing is not permitted is one of substance, not semantics." (*Parents Involved in Community Schools v. Seattle School Dist. No. 1* (2007) 551 U.S. 701, 732 [168 L.Ed.2d 508, 127 S.Ct. 2738] (*Parents Involved*).) Surely the same reasoning applies under section 31.

relied upon to protect minorities.' *United States* v. *Carolene Products Co.*, 304 U.S. 144, 153, n. 4 [82 L.Ed. 1234, 58 S.Ct. 778] (1938). In a most direct sense, this implicates the judiciary's special role in safeguarding the interests of those groups that are 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U.S. 1, 28 [36 L.Ed.2d 16, 93 S.Ct. 1278] (1973)." (*Seattle, supra,* 458 U.S. at pp. 485–486, italics omitted; see also *id.* at p. 474 ["The initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests."].)

Section 31 does not implicate this concern. It does not single out racial issues or racially oriented legislation for special treatment. It applies broadly to discrimination or preferential treatment "on the basis of race, sex, color, ethnicity, or national origin." (§ 31.) The inclusion of gender among the affected groups is particularly important, because it significantly broadens the application of the measure. The voters did not focus on a politically powerless racial minority, making it uniquely difficult for that group to achieve beneficial legislation. To the contrary, they passed a sweeping reform abolishing preferential treatment for a range of groups that includes everyone in the state, in various ways. Both the Ninth Circuit Court of Appeals, when it reviewed the constitutionality of section 31, and the Sixth Circuit, when it passed on the parallel Michigan measure, relied in part on such considerations to distinguish *Seattle*. (*Coalition for Economic Equity v. Wilson* (9th Cir. 1997) 122 F.3d 692, 707 (*Wilson*); *Coalition to Defend Affirmative Action v. Granholm* (6th Cir. 2006) 473 F.3d 237, 250–251.)

Section 31 is also quite different from the narrow antibusing measure struck down in *Seattle* because it does not take aim at a particular government activity. It applies generally to a wide range of functions, barring discrimination or preferences in "public employment, public education, [and] public contracting." (§ 31, subd. (a).) As the *Seattle* court noted, "[w]hen political institutions are more generally restructured . . . '[t]he very breadth of [the] scheme . . . negates any suggestion' of improper purpose."[2] (*Seattle, supra,* 458 U.S. at p. 486, fn. 30.) Section 31 was a sea change in state policy, of a kind not present in *Seattle* or any other "political structure" case. For the foregoing reasons, I agree with the majority that the "political structure doctrine" does not invalidate section 31.

---

[2] The quotation in this passage from *Seattle* was taken from a concurring opinion in *Walz v. Tax Commission* (1970) 397 U.S. 664, 689 [25 L.Ed.2d 697, 90 S.Ct. 1409], a case involving tax exemptions for religious institutions. That opinion also states: "Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society. [Citation.] To this end, New York extends

As alluded to in the majority opinion, the equal protection jurisprudence of the United States Supreme Court has undergone a change similar in scale to the reform enacted by section 31. Where the *Seattle* court once carefully guarded the prerogative of school districts to pursue desegregation programs, the *Parents Involved* court recently held that such programs themselves employ presumptively unconstitutional racial classifications and are subject to strict judicial scrutiny. The court has broadly called for a "logical end point" to "all governmental use of race," and approvingly referred to section 31 as a step in that direction. (*Grutter v. Bollinger* (2003) 539 U.S. 306, 342 [156 L.Ed.2d 304, 123 S.Ct. 2325]; see maj. opn., *ante*, at p. 332.) The various opinions issued by this court in this case reflect the difficulty of squaring the "political structure doctrine" with modern equal protection jurisprudence. Like the *Wilson* court, we have been "perplexed" by the persistence of this anachronistic feature of federal constitutional law. (*Wilson, supra*, 122 F.3d at p. 704; see also *id.* at p. 705, fn. 13 [noting "seemingly irreconcilable Supreme Court precedent"]; *Coalition to Defend Affirmative Action v. Regents of the University of Michigan* (E.D.Mich. 2008) 592 F.Supp.2d 948, 951 [noting "unevenness" created by *Seattle*].)[3]

It would be helpful for the United States Supreme Court to clarify matters by directly addressing the continued viability of the "political structure doctrine," in an appropriate case. The broad statements in *Seattle* casting suspicion on laws that may be characterized as "special burdens on the ability of minority groups to achieve beneficial legislation" (*Seattle, supra*, 458 U.S. at p. 467), or as attempts to "make[] the enactment of racially beneficial legislation difficult" (*id.* at p. 483), lend themselves to arguments distinctly at odds with the high court's own approach to racial classifications in such later cases as *Parents Involved*. Justice Moreno is correct, of course, when he points out that only the high court can ultimately resolve this tension. (See dis. opn., *post*, at pp. 366–367.)

**MORENO, J.,** Concurring and Dissenting.—California voters passed Proposition 209 in 1996, adding section 31 to article I of the state Constitution (section 31). The provision forbids public entities from discriminating against, "*or* grant[ing] *preferential treatment to*, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of

---

its exemptions not only to religious and social service organizations but also to scientific, literary, bar, library, patriotic, and historical groups, and generally to institutions 'organized exclusively for the moral or mental improvement of men and women.' " (*Ibid.* (conc. opn. of Brennan, J.).)

Although the context is different, section 31 also extends its reach to a variety of activities and groups.

[3] The high court itself has avoided employing the doctrine, even when its applicability was plain. (*Romer v. Evans* (1996) 517 U.S. 620, 625–626 [134 L.Ed.2d 855, 116 S.Ct. 1620]; see *Evans v. Romer* (Colo. 1993) 854 P.2d 1270, 1279–1282.)

public employment, public education, or public contracting." (§ 31, subd. (a), italics added.) This court later construed section 31 to ban not only preferences already prohibited by the federal equal protection clause (U.S. Const., 14th Amend., § 1), but also race- and sex-conscious remedial measures that the United States Constitution would otherwise permit. (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 567 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (*Hi-Voltage*).) We are now asked to resolve whether section 31 violates the federal Constitution.[1]

At the outset, I note several uncontroversial facts. Despite language forbidding discrimination (which added nothing to existing law), there can be little doubt Proposition 209 was enacted because of its effect on race- and sex-conscious preferences (and, given the ballot materials, primarily the former). Nor is there any serious uncertainty that the race- and sex-conscious preferences eliminated by section 31 primarily benefitted racial minorities and women and were so intended. Finally, it is uncontroverted that Proposition 209 did more than merely repeal existing programs; by amending the state Constitution, Proposition 209 requires those who would seek new race- and sex-conscious preferential programs to obtain the passage of another statewide initiative. By contrast, those seeking preferences on all other bases can resort to the usual, less burdensome, political process.[2] These facts, I conclude, require section 31 be invalidated as unconstitutional under the United States Supreme Court's decisions in *Hunter v. Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557] (*Hunter*) and *Washington v. Seattle School Dist. No. 1* (1982) 458 U.S. 457 [73 L.Ed.2d 896, 102 S.Ct. 3187] (*Seattle*).

In *Hunter* and *Seattle*, the high court established what has been called the political structure doctrine, a less familiar variant of equal protection analysis. In sum, the doctrine (and thus, the Constitution) is violated when a facially neutral law singles out a racial issue for special treatment and also alters the political process, entrenching the result and imposing unique structural burdens on minorities' future ability to obtain beneficial legislation. (*Seattle, supra*, 458 U.S. at pp. 470–474, 479–480; *Hunter, supra*, 393 U.S. at pp. 390–391.) That is, I submit, *precisely* what section 31 accomplishes. The arguments offered to the contrary are thin gruel. (Maj. opn., *ante*, at pp. 329–332; conc. opn. of Corrigan, J., *ante*, at pp. 339–340.) Whatever the concerns about the ongoing vitality of the political structure doctrine (conc.

---

[1] Unless otherwise noted, all subsequent references to a Constitution or an equal protection clause are to the *federal* Constitution and the *federal* equal protection clause.

[2] One more fact bears emphasizing: the *only* race-conscious programs uniquely affected by section 31 are those that could otherwise withstand strict scrutiny; that is, those narrowly tailored to further a compelling governmental interest, such as providing a remedy for purposeful discrimination. Programs unable to survive such scrutiny were already impermissible without section 31.

opn. of Corrigan, J., *ante*, at pp. 340–341), unless the United States Supreme Court decides to overrule its decisions, our obligation is to follow its clearly applicable and controlling precedent. (*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.* (1989) 490 U.S. 477, 484 [104 L.Ed.2d 526, 109 S.Ct. 1917].) Because the majority fails to do so, I must dissent.[3]

## I.

As the majority relates the facts and history of this case, there is no need to repeat them. However, the extent of the City and County of San Francisco's (City) efforts to investigate whether discrimination was a problem in its public contracting and, if so, whether there was a basis for a legislative remedy bears brief mention.

Prior to enacting the 1989 version of the City's Minority/Women/Local Business Utilization Ordinance (ordinance), the City "received, among other information, testimony from 42 witnesses, and written submittals from 127 minority, women, local, and other business representatives. Subsequently . . . the City held an additional ten public hearings, commissioned two statistical studies, and sought written submissions from the public." (*Associated General Contractors of California v. Coalition* (9th Cir. 1991) 950 F.2d 1401, 1404.)

After the 1989 ordinance expired, the City's board of supervisors and Human Rights Commission held an additional 14 public hearings, heard live testimony from 254 witnesses, videotaped testimony from numerous other witnesses, and considered additional statistical disparity studies and other documentary evidence pertinent to alleged discrimination and bidding irregularities. Minority contractors observed that, as compared with nonminority contractors, City inspectors imposed more onerous requirements on them, scrutinized their work more closely and treated them more harshly if they made mistakes. One minority contractor spoke of being harassed and subject to racist and derogatory remarks from City inspectors. Another complained of being subjected to more rigorous vetting despite his extensive qualifications and experience. Out of this process emerged the 1998 Ordinance.

The 1998 ordinance expired in 2003. The City conducted further investigations, including a disparity analysis and a Human Rights Commission report containing additional examples of continuing discrimination in public contracting. The City also conducted additional hearings at which 134 individuals testified. Minority contractors testified of ongoing discrimination

---

[3] As discussed below, I generally join the majority's analysis of the City's federal compulsion claim and concur with its decision to remand for further proceedings. I dissent from the holding as to the City's federal funding claim.

in the contracting process, and the board of supervisors heard evidence that prime contractors tried to circumvent compliance with the Ordinance. The board of supervisors made extensive legislative findings, including that the small percentage of City contracts going to minority- and women-owned businesses was due to discrimination by the City and discrimination in the private sector, that the City was actively discriminating against women and minority groups in its contracting and passively participating in private sector discrimination, that the City's contracting practices were in violation of federal law, and that the Ordinance was required to remedy the discrimination against minority- and women-owned businesses. The City thereafter enacted the 2003 ordinance, the version challenged by plaintiffs in this case.

## II.

### A. *The Political Structure Doctrine*

The City contends section 31 violates the political structure doctrine, the contours of which are set out in a trilogy of United States Supreme Court cases: *Hunter, supra,* 393 U.S. 385, and *Seattle, supra,* 458 U.S. 457, which established the basic tenets of the doctrine, and *Crawford v. Los Angeles Board of Education* (1982) 458 U.S. 527 [73 L.Ed.2d 948, 102 S.Ct. 3211] (*Crawford*), which described the doctrine's outer limits. I begin by discussing each case in turn.

#### 1. *Hunter*

In 1964, the city council in Akron, Ohio, enacted a fair housing ordinance prohibiting discrimination on the basis " 'of race, color, religion, ancestry or national origin.' " (*Hunter, supra,* 393 U.S. at p. 386.) The ordinance established a commission in the mayor's office to enforce the measure's provisions through conciliation or persuasion if possible, and by court order if necessary. (*Ibid.*) Hunter, an African-American woman, filed a complaint with the commission alleging a real estate agent had come to show her a list of houses for sale but, upon meeting Hunter, said she could not show Hunter the homes " 'because all of the owners had specified they did not wish their houses shown to negroes.' " (*Id.* at p. 387.)

Hunter was told the ordinance provided no remedy because the city charter had been amended in a citywide election to provide that any ordinance enacted by the city council regulating real estate transactions " 'on the basis of race, color, religion, national origin or ancestry must first be approved by a majority of the electors voting on the question at a regular or general election before said ordinance shall be effective. Any such ordinance in effect at the time of the adoption of this section shall cease to be effective until approved

by the electors as provided herein.' [Citation.]" (*Hunter, supra*, 393 U.S. at p. 387.) The proposed charter amendment had been placed on the ballot after more than 10 percent of Akron's voters had signed a petition, and the initiative was passed by a majority of voters. (*Ibid.*) Hunter sought a writ of mandamus in state court to enforce the ordinance, but the trial court ultimately concluded it had been rendered ineffective by the amended city charter, and the Supreme Court of Ohio affirmed. (*Id.* at pp. 387–388.) The high court reversed.

While suggesting the mere repeal of an ordinance would not violate the Fourteenth Amendment (*Hunter, supra*, 393 U.S. at p. 390, fn. 5), the Supreme Court noted the charter amendment went further by "not only suspend[ing] the operation of the existing ordinance forbidding housing discrimination, but also requir[ing] the approval of the electors *before any future ordinance could take effect*." (*Id.* at pp. 389–390, italics added.) In doing so, the charter amendment "drew a distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends." (*Id.* at p. 390.) Under the amended city charter, it became substantially more difficult for religious and racial minorities to secure the enactment of ordinances forbidding housing discrimination than for those seeking other ordinances. (*Ibid.*)

Ordinances not subject to the charter amendment would become effective 30 days after passage by the city council (or immediately, if passed as an emergency measure) and would be subject to referendum only if 10 percent of the voters so requested by signing a petition. (*Hunter, supra*, 393 U.S. at p. 390.) By contrast, the city council's approval would not be enough for those seeking ordinances to forbid racial and religious housing discrimination. (*Ibid.*) Those seeking ordinances to prevent housing discrimination would have to overcome the unique hurdle of obtaining the approval of a majority of voters in an election *before* such a city council-approved ordinance could be effective. (*Ibid.*)

That the charter amendment was facially neutral was of no moment, the high court explained. Even though it did not distinguish between various religious and racial groups, the amended charter "disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor." (*Hunter, supra*, 393 U.S. at

pp. 390–391.)[4] Moreover, the Supreme Court recognized that, "although the law on its face treats Negro and white, Jew and gentile in an identical manner, *the reality is that the law's impact falls on the minority*." (393 U.S. at p. 391, italics added.) Placing "special burdens on racial minorities within the governmental process . . . is no more permissible than denying them the vote, on an equal basis with others. [(Cf. *Gomillion v. Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]; *Reynolds v. Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; *Avery v. Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114].)]" (*Hunter*, at p. 391.) The high court's citation to its voting rights decisions (and specifically its vote dilution decisions) is enlightening, as it underscores that the doctrine's central focus is not on the attainment of particular legislative outcomes, but instead on ensuring minorities' *meaningful and equal access to the political process*.

Because the charter amendment singled out an issue of particular import to racial minorities and effectively entrenched the result by imposing unique hurdles in front of minorities' future efforts to achieve beneficial legislation, the court concluded it constituted a racial classification and applied strict scrutiny. (*Hunter, supra*, 393 U.S. at p. 392.) It ultimately found the asserted justifications for the amendment insufficient. (*Ibid.*) Of particular note, the court emphasized that "the implementation of this change through popular referendum [does not] immunize it. [Citation.] The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." (*Ibid.*) Having chosen a process for enacting legislation, the high court concluded, "the State may no more disadvantage any particular group by making it more difficult to enact *legislation in its behalf* than it may dilute any person's vote or give any group a smaller representation than another of comparable size. [Citations.]" (*Id.* at p. 393, italics added.)

## 2. *Seattle*

In 1977, Seattle School District No. 1 enacted a resolution to combat de facto racial segregation in the school system resulting from the housing patterns in Seattle, Washington. (*Seattle, supra*, 458 U.S. at p. 459.) The school district initially employed race-neutral voluntary measures; the steps taken, however, actually led to increased racial imbalance in the schools. (*Id.* at p. 461.) The school district ultimately determined "that mandatory reassignment of students was necessary if racial isolation in its schools was to

---

[4] The high court pointed out, for example, that the charter amendment did not affect "housing discrimination on sexual or political grounds, or against those with children or dogs, nor [did] it affect tenants seeking more heat or better maintenance from landlords, nor those seeking rent control, urban renewal, public housing, or new building codes." (*Hunter, supra*, 393 U.S. at p. 391.)

be eliminated" and thus implemented a program involving the extensive use of busing and mandatory reassignments in the elementary schools (the Plan). (*Ibid.*)

After a failed attempt to enjoin the implementation of the Plan, Seattle residents who opposed its remedial measures drafted a statewide ballot measure "designed to terminate the use of mandatory busing for purposes of racial integration." (*Seattle, supra*, 458 U.S. at p. 462.) The proposed initiative, which ultimately passed with 66 percent of the vote, prohibited school boards from " 'requir[ing] any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence . . . and which offers the course of study pursued by such student.' " (*Id.* at pp. 462–463.) While the initiative did not mention race or, "busing for racial purposes," it contained a number of exceptions to its ban (*id.* at p. 463), such that school districts were permitted to "bus their students 'for most, if not all,' of the nonintegrative purposes required by their educational policies. [Citation.]" (*Id.* at p. 471.) In light of these exceptions, the Supreme Court observed, it was clear that the measure was aimed solely at eliminating the remedy of "desegregative busing in general, and . . . the . . . Plan in particular." (*Id.* at p. 463.)[5]

Three school districts sued the State of Washington in federal court, arguing the initiative violated the equal protection clause. (*Seattle, supra*, 458 U.S. at p. 464.) The district court concluded the initiative constituted an impermissible racial classification in violation of the political structure doctrine because it forbade busing from being used as a remedy for racial segregation while permitting its use for all nonracial reasons. (*Id.* at p. 465.) The Ninth Circuit affirmed, and the state and state officers appealed. (*Id.* at p. 466.)

The high court began by noting the equal protection clause guarantees racial minorities "the right to full participation in the political life of the community." (*Seattle, supra*, 458 U.S. at p. 467.) To that end, the Fourteenth Amendment not only protects minorities' right to vote and to enter into the political process in a reliable and meaningful manner, but also "reaches 'a political structure that treats all individuals as equals,' [citation], yet more subtly distorts governmental processes in such a way *as to place special burdens on the ability of minority groups to achieve beneficial legislation.*"

---

[5] Indeed, while the federal district court found that the initiative's proponents had not "address[ed] 'its appeals to the racial biases of the voters . . . ' [citation]" (*Seattle, supra*, 458 U.S. at p. 463), it found that they had communicated that the measure's passage "would result in 'no loss of school district flexibility other than in busing for desegregation purposes,' [citation]" and they "focused almost exclusively on the wisdom of 'forced busing' for integration. [Citation.]" (*Ibid.*)

(*Seattle*, at p. 467, italics added.) This "political structure" principle, the high court noted, was expressed and applied in *Hunter* and *Lee v. Nyquist* (W.D.N.Y 1970) 318 F.Supp. 710, summarily affd. *sub. nom. Nyquist v Lee* (1971) 402 U.S. 935 [29 L.Ed.2d 105, 91 S.Ct. 1618].[6] (*Seattle*, at pp. 467–469.) From these cases (as well as from Justice Harlan's concurring opinion in *Hunter, supra*, 393 U.S. at pages 393–396), the *Seattle* court drew "a simple but central principle" (*Seattle*, at p. 469): "[L]aws structuring political institutions or allocating political power according to 'neutral principles'—such as the executive veto, or the typically burdensome requirements for amending state constitutions—are not subject to equal protection attack, though they may 'make it more difficult for minorities to achieve favorable legislation.' [(*Hunter, supra*,] 393 U.S. at [p.] 394 [(conc. opn. of Harlan, J.).)] Because such laws make it more difficult for *every* group in the community to enact comparable laws, they 'provid[e] a just framework within which the diverse political groups in our society may fairly compete.' (*Id.*, at p. 393.) Thus, the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process." (*Seattle, supra*, 458 U.S. at p. 470.)

Applying the political structure doctrine to the ballot measure, the Supreme Court concluded that, rather than attempting " 'to allocate governmental power on the basis of any general principle' [citation]" (*Seattle, supra*, 458 U.S. at p. 470), it impermissibly used "the racial nature of an issue to define the governmental decisionmaking structure, and thus impose[d] substantial and unique burdens on racial minorities." (*Ibid.*)

In so holding, the court conducted a two-part inquiry. It first inquired whether the initiative, despite its facial neutrality, singled out a racial issue for special treatment. (*Seattle, supra*, 458 U.S. at p. 471.) While the initiative nowhere mentioned "race" or "integration," the court had little difficulty finding it was nonetheless "effectively drawn for racial purposes." (*Ibid.*)[7] As evidence, the court pointed to the fact that the exceptions in the initiative meant that only desegregative busing was prohibited, which was consistent

---

[6] In *Lee v. Nyquist, supra*, 318 F.Supp. at page 712, state education officials directed the City of Buffalo, which had an appointed school board, to implement remedies to combat de facto segregation. In response, the New York Legislature enacted a statute barring state officials and appointed (but not elected) school boards from assigning students to schools on the basis of race, while leaving the school boards and state officials with student assignment authority for all other reasons. (*Id.* at pp. 712, 719.) The three-judge *Lee* court struck down the statute, applying the political structure doctrine. (*Id.* at pp. 718–719.)

[7] "Racial purpose" does not refer to the drafters' (or voters') invidious intent. (*Seattle, supra*, 458 U.S. at pp. 484–486.) Rather, a racial purpose may be found when, among other things, a law is enacted because of, rather than in spite of, its effect on the racial issue. (*Id.* at p. 471.)

with the proponents' statements during the campaign. (458 U.S. at p. 471.) "It is beyond reasonable dispute, then, that the initiative was enacted ' "because of," not merely "in spite of," its adverse effects upon' busing for integration. [Citation.]" (*Ibid.*)

In addition, the court noted that busing for integration is a racial issue that, "at bottom *inures primarily to the benefit of the minority, and is designed for that purpose.*" (*Seattle, supra,* 458 U.S. at pp. 471–472, italics added.) While so concluding, the court acknowledged that racial minorities, as well as those in the majority, could be counted among both the proponents and opponents of the ballot measure, just as both racial minority and majority members benefited from diverse schools. (*Id.* at p. 472.) "But neither of these factors serves to distinguish *Hunter,* for we may fairly assume that members of the racial majority both favored and benefited from Akron's fair housing ordinance. [Citations.]" (*Ibid.*) "[I]t *is enough that minorities may consider busing for integration to be 'legislation that is in their interest.'* [Citation.] Given the racial focus of [the initiative], this suffices to trigger application of the *Hunter* doctrine." (*Id.* at p. 474, italics added.)

For the second part of its inquiry, the high court considered whether "the *practical effect* of [the ballot measure] is to work a reallocation of power of the kind condemned in *Hunter.*" (*Seattle, supra,* 458 U.S. at p. 474, italics added.) In concluding the initiative did so, the court noted that the ballot measure "removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." (*Ibid.*) After passage of the measure, those seeking to address school segregation had to seek relief from the state legislature or from the statewide electorate; by comparison, those wishing to effect any other nonracial school reassignment or educational policy needed only to petition their local school board. (*Ibid.*) Thus, the changed political structure "expressly requires those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action. As in *Hunter,* then, the community's political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government." (*Seattle,* at p. 474.)[8]

In concluding the initiative had worked an impermissibly nonneutral alteration of the political structure, the court considered, and rejected, arguments raised by Justice Powell's dissent and the defendants. Justice Powell argued

---

[8] Under Washington's Constitution, voters could propose initiatives (*Seattle, supra,* 458 U.S. at p. 462, fn. 4 [citing Wn. Const., art. II, § 1]) and, if a measure passed, it could not be repealed by the legislature for two years (although it could be amended within two years by a vote of two-thirds of each house of the legislature). (*Seattle, supra,* at p. 462, fn. 4 [citing Wn. Const., art. II, § 41].)

this case was unlike *Hunter* because "the political system [of Washington] has *not* been redrawn or altered." (*Seattle, supra*, 458 U.S. at p. 498 (dis. opn. of Powell, J.).) The majority dismissed this distinction as facile, pointing out "[t]he evil condemned by the *Hunter* Court was not the particular political obstacle of mandatory referenda imposed by the Akron charter amendment; it was, rather, the *comparative structural burden* placed on the political achievement of minority interests." (*Id.* at pp. 474–475, fn. 17, italics added.)[9] In both cases, the power to enact racial legislation was relocated to a more distant level, the citywide electorate in *Hunter* and the statewide electorate or the state legislature in *Seattle*. (458 U.S. at pp. 474–475, fn. 17.)[10]

The court also rejected the defendants' contention that the ballot measure merely constituted a permissible intervention by the state in its own school system. (*Seattle, supra*, 458 U.S. at pp. 475–476.) While it acknowledged that Washington had plenary authority over its education system, the court pointed out that "[t]he issue here . . . is not whether Washington has the authority to intervene in the affairs of local school boards; it is, rather, whether the State has exercised that authority in a manner consistent with the Equal Protection Clause." (*Id.* at p. 476.) Having previously chosen to vest decisionmaking authority of the type at issue here in local school boards (*id.* at pp. 477–480), the ballot measure "worked a major reordering of the State's educational decisionmaking process. . . . After [the] passage of [the ballot measure], authority over all but one of those areas remained in the hands of the local board. By placing power over desegregative busing at the state level, then, [the initiative] plainly '*differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area.*' [Citation.]" (*Id.* at pp. 479–480, italics added.)[11]

---

[9] The majority continued, explaining that *Hunter* would have been virtually identical to *Seattle* had the charter amendment simply precluded the city council from passing any fair housing ordinance. (*Seattle, supra*, 458 U.S. at pp. 474–475, fn. 17.) "Surely, however, *Hunter* would not have come out the other way had the charter amendment made *no* provision for the passage of fair housing legislation, instead of subjecting such legislation to ratification by referendum." (*Ibid.*)

[10] The majority also rejected Justice Powell's claim that *Seattle* was different because proponents of integrated schools remained free to use Washington's initiative system to achieve their goals. (*Seattle, supra*, 458 U.S. at pp. 474–475, fn. 17.) The majority pointed out the same was true in *Hunter*; "[i]t surely is an excessively formal exercise, then, to argue that the procedural revisions at issue in *Hunter* imposed special burdens on minorities, but that the selective allocation of decisionmaking authority worked by [the ballot measure] does not erect comparable political obstacles." (*Ibid.*)

[11] The majority also emphasized that, despite the dissent's assertions to the contrary, it was not creating a constitutional right either to local decisionmaking or to desegregative busing. (*Seattle, supra*, 458 U.S. at p. 480, fn. 23.) Rather, its decision was predicated upon "the comparative burden [the ballot measure] imposes on minority participation in the political

Moreover, the court noted, while voters are free to merely repeal unpopular legislation at the ballot box, the initiative went further. (*Seattle, supra*, 458 U.S. at p. 483.) "It burdens all *future* attempts to integrate Washington schools in districts throughout the State, by lodging decisionmaking authority over the question at a new and remote level of government." (*Ibid.*, italics added.) This new political structure "imposes direct and undeniable burdens on minority interests. 'If a governmental institution is to be fair, one group cannot always be expected to win,' [citation]; by the same token, one group cannot be subjected to a debilitating and often insurmountable disadvantage." (*Id.* at p. 484.)

The high court ultimately concluded strict scrutiny applied to the initiative because, "when the political process or the decisionmaking mechanism used to *address* racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the governmental action plainly 'rests on "distinctions based on race." ' [Citation.]" (*Seattle, supra*, 458 U.S. at p. 485, fn. omitted.) It continued, "when the State's allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the 'special condition' of prejudice, the governmental action seriously 'curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities.' [(*United States v. Carolene Products Co.* (1938) 304 U.S. 144, 153, fn. 4 [82 L.Ed. 1234, 58 S.Ct. 778].)]" (*Seattle*, at p. 486.) The court thus concluded the initiative violated the Fourteenth Amendment and was invalid. (*Seattle*, at p. 487.)[12]

### 3. *Crawford*

In 1963, minority students attending school in the Los Angeles Unified School District filed a class action in state court seeking to desegregate the district's schools. (*Crawford, supra*, 458 U.S. at pp. 529–530.) In 1970, the trial court found substantial segregation in violation of the state and federal Constitutions and ordered the district to prepare a desegregation plan. (458 U.S. at p. 530.) Although the court had found de jure segregation in violation of the Fourteenth Amendment, we affirmed its ruling based solely upon California's equal protection clause. (458 U.S. at p. 530, citing *Crawford v.*

---

process—that is, the racial nature of the way in which it structures the *process* of decisionmaking. . . . [T]he State remains free to vest all decisionmaking power in state officials, or to remove authority from local school boards in a race-neutral manner." (*Ibid.*)

[12] It also noted that, "Certainly, a state requirement that 'desegregation or antidiscrimination laws,' [citation], and only such laws, be passed by a unanimous vote of the legislature would be constitutionally suspect. It would be equally questionable for a community to require that laws or ordinances 'designed to ameliorate race relations or to protect racial minorities,' [citation], be confirmed by popular vote of the electorate as a whole, while comparable legislation is exempted from a similar procedure." (*Seattle, supra*, 458 U.S. at pp. 486–487.)

*Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28].) We explained the state Constitution was broader than its federal counterpart, requiring districts to take reasonable steps to address segregation, " 'whether [it] be de facto or de jure in origin.' [(*Crawford v. Board of Education, supra,* 17 Cal.3d at p. 290.)]" (*Crawford, supra,* 458 U.S. at pp. 530–531.)

On remand, the trial court considered possible desegregation plans, first approving a plan including mandatory busing and then considering alternatives. (*Crawford, supra,* 458 U.S. at p. 531.) In the meantime, California's voters passed Proposition 1, amending article I, section 7 of the state Constitution. (*Crawford,* at pp. 531–532 & fn. 5.) The proposition conformed the power of state courts to order busing *for any reason* to federal courts' power under the Fourteenth Amendment, but did not prohibit schools boards " 'from voluntarily continuing or commencing a school integration plan.' " (458 U.S. at p. 532 & fn. 6, quoting Cal. Const., art. I, § 7, as amended Nov. 6, 1979.)

Following Proposition 1's passage, the school district sought to halt all mandatory student reassignment and busing, but the trial court denied the request based on its prior finding of de jure segregation in violation of the federal Constitution. (*Crawford, supra,* 458 U.S. at p. 533.) The state Court of Appeal reversed. It concluded the trial court's finding of de jure segregation was not supported, and thus Proposition 1 applied, so it barred the trial court from ordering mandatory student reassignment and busing. (458 U.S. at pp. 533–534.) The Court of Appeal also concluded Proposition 1 was constitutional under the Fourteenth Amendment because California was not obliged to provide a greater remedy against racial segregation than what was provided under the federal Constitution. (*Crawford,* at p. 534.) We denied review, and the high court granted certiorari. (*Ibid.*)

The Supreme Court held Proposition 1 did not violate the Fourteenth Amendment generally, or the political structure doctrine specifically, concluding the initiative merely repealed this court's interpretation of California's Constitution as imposing broader desegregation obligations than those imposed by the federal Constitution. (*Crawford, supra,* 458 U.S. at pp. 535–536, 537, fn. 14.) The high court distinguished *Hunter* and *Seattle* in three critical respects: first, it noted that, under Proposition 1, school districts remained free as before to adopt reassignment and busing plans based on race to combat segregation (458 U.S. at p. 536); second, it noted Proposition 1 did not single out the issue of desegregative student assignment and busing, but rather, it removed state courts' power to order reassignment and busing for *any reason,* racial or otherwise (458 U.S. at p. 538, fn. 18); and third, it noted Proposition 1 constituted a mere repeal of a right by the same

entity—the people—who created it in the first place (via adoption of the state Constitution) (*Crawford*, at p. 542; *id.* at p. 547 (conc. opn. of Blackmun, J.)).[13]

### 4. *Summary of the Doctrine's Scope*

From these cases, the contours of the political structure doctrine can be delineated. For a law to violate the doctrine, and thus require application of heightened scrutiny, two conditions must be met.

First, the law must single out a racial issue for special treatment. (*Seattle, supra*, 458 U.S. at pp. 470–474; *Hunter, supra*, 393 U.S. at pp. 390–391.)[14] That a law is facially neutral is of no consequence (*Seattle*, at p. 471; *Hunter*, at pp. 390–391); rather, we ask whether it was "effectively drawn for racial purposes." (*Seattle*, at p. 471.) In speaking of a law's "purpose," we do not mean whether it was motivated by invidious intent. (*Id.* at pp. 484–486.) A racial purpose exists where the law was enacted because of, rather than in spite of, its effect upon the racial issue (*id.* at p. 471) or where the law's "impact falls on the minority" (*Hunter*, at p. 391) because the repealed policy "inures primarily to [minorities'] benefit . . . and is designed for that purpose." (*Seattle*, at pp. 471–472.)

Second, the law must restructure the political process in a nonneutral manner, imposing unique burdens on minorities' future efforts to enact beneficial legislation. (*Seattle, supra*, 458 U.S. at pp. 474, 479–480; *Hunter, supra*, 393 U.S. at pp. 390–391.)[15] In other words, we ask whether the law effectively entrenches the result by altering the process such that a "comparative structural burden [is] placed on the political achievement of minority interests" (*Seattle*, at p. 475, fn. 17) in contrast to the " 'treatment . . . afforded other problems in the same area' " (*id.* at pp. 479–480).

For a violation of the doctrine to be established, *both* conditions must be met; one alone will not suffice. For example, the repeal of a law advantaging

[13] The high court issued its opinions in *Seattle* and *Crawford* on the same day. Notably, four members in the *Seattle* majority were also in the *Crawford* majority (Justices Brennan, White, Blackmun (the author of *Seattle*), and Stevens).

[14] Although the court's analysis in *Hunter* and *Seattle* concerned racial minorities, nothing suggests the doctrine would not also apply to other suspect classes, such as women. (Cf. *Evans v. Romer* (Colo. 1993) 854 P.2d 1270, 1279–1282 [concluding the principle cannot be logically limited to the race context], affd. on other grounds *sub. nom. Romer v. Evans* (1996) 517 U.S. 620 [134 L.Ed.2d 855, 116 S.Ct. 1620].)

[15] As *Hunter* and *Seattle* demonstrate, a law can restructure the political process either *explicitly* (e.g., the amended charter in *Hunter* explicitly required that future housing discrimination ordinances receive voter approval before going into effect) or *implicitly* (e.g., the voter initiative taking away school boards' power to order desegregative busing in *Seattle* had the practical effect of requiring another ballot measure or action by the state legislature).

racial minorities certainly singles out a racial issue for special treatment. However, without more, the mere repeal of such a law by the enacting governmental entity does not run afoul of the doctrine. (*Crawford*, 458 U.S. at p. 547 (conc. opn. of Blackmun, J.); *Seattle, supra*, 458 U.S. at pp. 483; *Hunter, supra*, 393 U.S. at p. 390 & fn. 5.)[16] It simply "reflects the normal operation of the political process in which there are winners and losers. Repeal of legislation favorable to the interests of a racial minority simply indicates that a prior winner has now lost . . . [but] does not alter or distort the existing political process in any way." (Amar & Caminker, *Equal Protection, Unequal Political Burdens, and the CCRI* (1996) 23 Hastings Const. L.Q. 1019, 1044 (Amar & Caminker); see *Hunter*, at p. 394 (conc. opn. of Harlan, J.).)

As another example, amending California's Constitution to require that 25 percent of the electorate sign a petition before an initiative can qualify to be placed on the ballot (as opposed to the current, lower requirement in Cal. Const., art. II, § 8) would without a doubt "make it more difficult for minorities to achieve favorable legislation" via the initiative process. (*Hunter, supra*, 393 U.S. at pp. 393–394 (conc. opn. of Harlan, J.).) However, such an alteration would not violate the doctrine because such a change would be "grounded in neutral principle." (*Id.* at p. 395; see *Seattle, supra*, 458 U.S. at p. 480, fn. 23.) Because such a change to the process would "make it more difficult for *every* group in the community to enact comparable laws," there would continue to be a level playing field on which vying political groups could compete. (*Seattle*, at p. 470.)

Thus, only when a law singles out a racial issue for special treatment *and* alters the political process, imposing a unique structural burden on minorities' future ability to achieve beneficial legislation, is the political structure doctrine violated and is the law subject to heightened scrutiny.

### B. *Proposition 209 and* Hi-Voltage

Before explaining why section 31 violates the political structure doctrine, it is necessary to first briefly revisit Proposition 209, the ballot measure that enacted section 31, and *Hi-Voltage, supra*, 24 Cal.4th 537, in which this court construed section 31's scope.

---

[16] Indeed, the high court indicated that, had the voters in *Hunter* merely repealed the fair housing ordinance or had the school board in *Seattle* ended its race-conscious busing plan without also altering the process for obtaining future legislation, the doctrine would not have been violated. (*Seattle, supra*, 458 U.S. at p. 483; *Hunter, supra*, 393 U.S. at pp. 389–390 & fn. 5.)

### 1. *Proposition 209 and the November 5, 1996, Election*

After Proposition 209 qualified as an initiative constitutional amendment, it was placed on the November 5, 1996, General Election ballot. Prior to the election, voters received an official ballot pamphlet prepared by the nonpartisan Legislative Analyst's Office. (*Coalition for Economic Equality v. Wilson* (N.D.Cal. 1996) 946 F.Supp. 1480, 1493 (*Coalition I*).)[17] The ballot pamphlet, which included an official description and analysis of each statewide initiative, described Proposition 209 as a measure that would eliminate race- and sex-conscious affirmative action programs in the areas of public employment, contracting, and education. (946 F.Supp. at p. 1493.) The Legislative Analyst's brief summary explained "A **YES** vote on [Proposition 209] means: The elimination of those affirmative action programs for women and minorities run by the state or local governments in the areas of public employment, contracting, and education that give 'preferential treatment' on the basis of sex, race, color, ethnicity, or national origin." "A **NO** vote on [Proposition 209] means: State and local government affirmative action programs would remain in effect to the extent they are permitted under the United States Constitution." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) (Ballot Pamphlet) Legis. Analyst's brief summary of Prop. 209, p. 6.)

In addition to its summary of the measure, the Legislative Analyst provided a more in-depth analysis, emphasizing that passage of the initiative would effectively abolish all race- and sex-conscious affirmative action programs. "The federal, state, and local governments run many programs intended to increase opportunities for various groups—including women and racial and ethnic minority groups. These programs are commonly called 'affirmative action' programs. . . . [¶] . . . [¶] [Proposition 209] would eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting to the extent these programs involve 'preferential treatment' based on race, sex, color, ethnicity, or national origin." (Ballot Pamp., *supra*, Legis. Analyst's analysis of Prop. 209, p. 30.) The Legislative Analyst then discussed various race- and sex-conscious affirmative action programs in the areas of public employment, contracting, and education that would be banned with the passage of the initiative. (*Id.* at p. 31.)

In addition to the nonpartisan analysis by the Legislative Analyst, the Ballot Pamphlet contained partisan arguments submitted by proponents and

---

[17] The federal district court preliminarily enjoined enforcement of Proposition 209 (*Coalition I, supra*, 946 F.Supp. at p. 1510), but the injunction was lifted by the Ninth Circuit (*Coalition for Economic Equality v. Wilson* (9th Cir. 1997) 122 F.3d 692, rehg. en banc den. Aug. 27, 1997 (*Coalition II*)). I cite the district court's factual findings, which were also cited by the Ninth Circuit (*id.* at p. 705) and this court (*Hi-Voltage, supra*, 24 Cal.4th at p. 561).

opponents of the measure. These arguments further underscored that the central issue at stake in Proposition 209 was race- and sex-conscious affirmative action (and race-conscious measures in particular). The argument in favor of the measure stated, " 'REVERSE DISCRIMINATION' BASED ON RACE OR GENDER IS PLAIN WRONG! [¶] . . . [S]tudents are being rejected from public universities because of their RACE. Job applicants are turned away because their RACE does not meet some 'goal' or 'timetable.' Contracts are awarded to high bidders because they are of the preferred RACE. [¶] . . . [¶] . . . Proposition 209 will stop the terrible programs . . . ." (Ballot Pamp., *supra*, argument in favor of Prop. 209, p. 32.) The argument against the initiative warned that "California law currently allows tutoring, mentoring, outreach, recruitment, and counseling to help ensure equal opportunity for women and minorities. Proposition 209 will eliminate affirmative action programs like these that help achieve equal opportunity for women and minorities in public employment, education and contracting." (*Id.*, argument against Prop. 209, p. 33.)

In explaining that Proposition 209 would eliminate race- and sex-conscious affirmative action programs, the Legislative Analyst, proponents, and opponents implicitly acknowledged preferential treatment on all other bases would be unaffected by the ballot measure. (See *Hi-Voltage, supra*, 24 Cal.4th at p. 566; *id.* at pp. 586–587 (conc. & dis. opn. of George, C. J.).) Indeed, this was *explicitly* recognized in the rebuttal to the argument against Proposition 209. "Affirmative action programs that don't discriminate or grant preferential treatment [on the basis of race or sex] will be UNCHANGED. . . . [¶] Note that Proposition 209 doesn't prohibit consideration of economic disadvantage. . . . The state must remain free to help the economically disadvantaged, but not on the basis of race or sex." (Ballot Pamp., *supra*, rebuttal to argument against Prop. 209, p. 33.)

On November 5, 1996, Proposition 209 passed, with 54 percent voting in favor of the measure and 46 percent voting against. (*Coalition I, supra*, 946 F.Supp. at p. 1495.) White voters were the only racial group that, as a majority, voted in favor of Proposition 209, with 63 percent voting for passage. (946 F.Supp. at p. 1495, fn. 12.) Seventy-four percent of Black voters, 76 percent of Latino voters, and 61 percent of Asian-American voters opposed the measure. (*Ibid.*) Sixty-one percent of men voted in favor, while 52 percent of women voted against. (*Ibid.*)

2. Hi-Voltage *and Our Construction of Section 31*

In 2000, this court considered the validity of a program adopted by the City of San Jose to encourage the participation of minority-owned business enterprises and women-owned business enterprises in public works projects.

(*Hi-Voltage, supra*, 24 Cal.4th at p. 542.) Contractors bidding for city projects were required to fulfill either an outreach or a participation component, and the plaintiffs argued that the program's requirements violated section 31. (*Hi-Voltage*, at pp. 543–544.) We agreed, concluding the program's "outreach option affords preferential treatment to [minority-/women-owned business enterprise] subcontractors on the basis of race or sex, and the participation option discriminates on the same bases against non-[minority-/women-owned business enterprise] subcontractors as well as general contractors that fail to fulfill either of the options when submitting their bids." (*Id.* at p. 560, fn. omitted.)

In reaching this conclusion, we reviewed the language of section 31 as well as the ballot materials accompanying Proposition 209. (*Hi-Voltage, supra*, 24 Cal.4th at pp. 559–562.) We noted the measure's language was not limited in any way and effectively prohibited all race- and sex-conscious affirmative action programs. (*Id.* at pp. 559–560; *id.* at pp. 591–592 (conc. & dis. opn. of George, C. J.).) Turning to the ballot materials, we concluded the partisan statements and the Legislative Analyst's analysis provided further support for our construction. (*Id.* at pp. 560–562.) In particular, we noted the proponents' statements focused on race- and sex-conscious affirmative action programs and evinced a clear desire to ban all such programs. (*Id.* at pp. 560–561.)

This court ultimately concluded the electorate intended to do "something more" than restate existing law prohibiting discrimination on the basis of race or sex. (*Hi-Voltage, supra*, 24 Cal.4th at p. 561 [citing *Coalition I, supra*, 946 F.Supp. at p. 1489].)[18] That "something more," the majority reasoned, was a repudiation of case law permitting race- and sex-conscious measures "formulated to remediate the lingering effects of past discrimination or conspicuous imbalance" in public contracting, employment, and education. (*Hi-Voltage, supra*, at p. 566.) We accordingly held that, following the adoption of section 31, "*any* action that discriminates or grants preferential treatment on the basis of race or sex would be forbidden," including race- and sex-conscious measures that would otherwise be permitted by the equal protection clause. (*Hi-Voltage*, at pp. 566–567.)

Thus, the practical effect of section 31's ban of race- and sex-conscious measures is limited to just one category of legislation. It has no independent effect on legislation that cannot survive heightened scrutiny because such legislation already violates the Constitution. (See *Hi-Voltage, supra*, 24 Cal.4th at p. 561.) It also has no effect on legislation *required* by the Constitution

---

[18] As the court in *Coalition I, supra*, 946 F.Supp. at page 1488, explained, section 31's ban on discrimination "simply reaffirms existing anti-discrimination protections already provided by the United States and California Constitutions, and by the 1964 Civil Rights Act . . . [and] creates no change in existing law."

(U.S. Const., art. VI, cl. 2), when, for example, a public entity seeks to remedy its own past intentional discrimination (*Hi-Voltage*, at p. 568). Consequently, section 31's only nonredundant effect is on race- and sex-conscious measures that are permitted, but not required, by the Constitution, i.e., legislation that, despite classifying on the basis of race or sex, can survive heightened scrutiny. For race-conscious programs to do so, they must be narrowly tailored and justified by a compelling interest. (*McLaughlin v. Florida* (1964) 379 U.S. 184, 191–192 [13 L.Ed.2d 222, 85 S.Ct. 283].) Under the high court's decisions, this category of legislation has become increasingly narrow.

For example, in public contracting, a race-conscious program must be narrowly tailored to remedy the effects of past discrimination by the public entity itself or by private sector entities within its jurisdiction. (*Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469, 498–506 [102 L.Ed.2d 854, 109 S.Ct. 706] (*Croson*).) The Supreme Court has rejected as insufficiently compelling the remedying of societal discrimination (*id.* at p. 505) or the attainment of racial balance in an industry (*id.* at p. 507). Similarly, in public employment, remedying the effects of past discrimination by the public entity is a compelling interest, while remedying societal discrimination is not. (*Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 274 [90 L.Ed.2d 260, 106 S.Ct. 1842] (plur. opn. of Powell, J.).) In the public education context, in addition to remedying the effects of past discrimination, the high court has found compelling the promotion of racial diversity in higher education. (*Parents Involved in Community Schools v. Seattle School Dist. No. 1* (2007) 551 U.S. 701, 720 [168 L.Ed.2d 508, 127 S.Ct. 2738]; *Grutter v. Bollinger* (2003) 539 U.S. 306, 325 [156 L.Ed.2d 304, 123 S.Ct. 2325].) Thus, the only real change section 31 makes to existing law is to close an already narrow, albeit significant, window of constitutionally permissible remedial legislation. (*Hi-Voltage, supra*, 24 Cal.4th at p. 568.)

## C. *Application of the Political Structure Doctrine to Section 31*

I now discuss why section 31 violates the political structure doctrine. The first step of the inquiry requires consideration of whether section 31, while facially neutral, nonetheless singles out a racial issue for special treatment. (*Seattle, supra*, 458 U.S. at p. 471.) The answer is plainly yes.

Section 31 prohibits preferential treatment "on the basis of race, sex, color, ethnicity, or national origin." (§ 31, subd. (a).) Thus, as with the charter amendment in *Hunter*, section 31 is explicitly race conscious. In addition, it singles out a racial issue for special treatment inasmuch as it draws a distinction between groups seeking beneficial legislation on the basis of race and sex (i.e., racial minorities and women) and those seeking beneficial

legislation on all other bases (e.g., veterans, the economically disadvantaged, in-state residents, local businesses, physically disabled, athletes, etc.). (*Hunter, supra*, 393 U.S. at pp. 390–391; see Ballot Pamp., *supra*, rebuttal to argument against Prop. 209, p. 33.) For example: California (along with many other entities) grants civil service preferences to veterans (see, e.g., Gov. Code, § 18978); cities and counties may grant contracting preferences to locally owned or economically disadvantaged businesses (see, e.g., S.F. Admin. Code, ch. 6, § 6.4; *id.*, ch. 14A);[19] some public school districts grant preferences to children of former students (see, e.g., Mehta, *Public Schools Offer Legacy Admissions*, L.A. Times (May 16, 2009) p. A3 [discussing school districts' adoption of admission policy giving preference to out-of-district children of former students]). Put another way, section 31 does not purport to regulate the enactment of *all* preferential legislation in the operation of public employment, public education, or public contracting, but rather only race- and sex-conscious preferences in those arenas.

Moreover, there can be no serious doubt that section 31 was "enacted ' "because of," not merely "in spite of," its adverse effects upon' " race- and sex-based affirmative action, and was therefore "effectively drawn for racial purposes." (*Seattle, supra*, 458 U.S. at p. 471.) Indeed, the ballot summary and the partisan statements underscore that the measure's central purpose was to effectively eliminate all race- and sex-based affirmative action. (E.g., Ballot Pamp., *supra*, Legis. Analyst's brief summary of Prop. 209, p. 6; *id.*, argument in favor of Prop. 209, p. 32.) We arrived at the same conclusion in *Hi-Voltage*. (*Hi-Voltage, supra*, 24 Cal.4th at pp. 566–567; *id.* at pp. 591–592 (conc. & dis. opn. of George, C. J.).)

Finally, affirmative action is a racial issue in the same way that the fair housing ordinance in *Hunter* and the desegregative busing in *Seattle* were racial issues. (*Seattle, supra*, 458 U.S. at pp. 471–472; *Hunter, supra*, 393 U.S. at p. 391.) That is, "although [section 31] on its face treats [Whites and racial minorities, men and women] in an identical manner, the reality is that the law's impact falls on the minority." (*Hunter*, at p. 391.) Affirmative action "inures primarily to the benefit of the minority, and is designed for that purpose." (*Seattle*, at p. 472.) And while racial minorities and women could undoubtedly be counted among both Proposition 209's opponents *and* supporters, that does not serve to distinguish *Hunter* or *Seattle*. (*Seattle*, at p. 474.) For our purposes, "it is enough that [racial minorities and women] may consider [race- and sex-conscious affirmative action] to be 'legislation

---

[19] The manner in which a city contracts is generally a municipal affair. (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1175 [78 Cal.Rptr.3d 572].) However, the Public Contract Code requires cities and counties to use the lowest responsible bidder on public works projects (Pub. Contract Code, §§ 20160, 20162 [cities]; *id.*, §§ 20120, 20128 [counties]) with certain enumerated exceptions (see, e.g., *id.*, § 2002 [local agencies can give small business preference]).

that is in their interest.' [Citation.]" (*Ibid.*)[20] In summary, based on section 31's language, its different treatment of race- and sex-conscious legislation as compared to other legislation in the same area, its avowed purpose, and whom it primarily affects, I conclude section 31 without question singles out a racial issue for special treatment, triggering application of the political structure doctrine. (See *Seattle*, at p. 474.)[21]

The second step of the inquiry requires consideration of whether section 31 constitutes a nonneutral restructuring of the political process, placing higher hurdles in front of those seeking race- and sex-conscious measures as opposed to what those seeking beneficial legislation on all other bases face. (*Seattle, supra*, 458 U.S. at p. 474 & fn. 17.) As in *Hunter* and *Seattle*, the most obvious way to answer this question is to examine the impact of Proposition 209's passage on the process for obtaining favorable legislation. Because the practical effect of section 31 is the erection of a steep hurdle in front of those seeking race- and sex-conscious preferential legislation (as compared with those seeking similar legislation on other bases), section 31 obviously "work[s] a reallocation of power of the kind condemned [by the high court]." (*Seattle*, at p. 474.)

Prior to Proposition 209, any person seeking beneficial legislation for any group in the areas of public contracting, employment, or education could petition their government representatives to adopt, amend, or retain such a program. (*Coalition I, supra*, 946 F.Supp. at p. 1498.) For example, in matters of public contracting, Public Contract Code section 2000 gave local agencies the discretion, subject to certain limitations, to give bidding preferences to contractors who had complied with affirmative action requirements. (See *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1400–1403 [52 Cal.Rptr.2d 395]; *Domar Electric, Inc. v. City of Los Angeles* (1995) 41 Cal.App.4th 810, 820–822 [48 Cal.Rptr.2d 822].) With the passage of Proposition 209, the decision to permit and create such programs has been withdrawn from the Legislature and from

[20] Indeed, as previously noted, the substantial majority of Blacks (74 percent), Latinos (76 percent), and Asian-Americans (61 percent), and a majority of women (52 percent), voted against Proposition 209. (See, *ante*, at p. 356.)

[21] The majority does not dispute that section 31 singles out a racial issue for special treatment. While the concurring opinion does so (conc. opn. of Corrigan, J., *ante*, at p. 340), its rationale lacks a reasoned basis. It relies on the fact that section 31 targets not only race, but gender as well, thus "broaden[ing] the application of the measure." (Conc. opn. of Corrigan, J., *ante*, at p. 340.) Of course, the charter amendment in *Hunter* applied not only to race, but to religion as well; this fact did not prevent the charter amendment's invalidation. (*Hunter, supra*, 393 U.S. at p. 387.) Moreover, as noted by Judge Norris in his dissent from the Ninth Circuit's decision to deny en banc rehearing of the panel decision in *Coalition II*, combining various suspect classes into one undifferentiated group for purposes of equal protection analysis is without basis in case law or common sense. (*Coalition II, supra*, 122 F.3d at p. 716 (opn. of Norris, J., on denial of rehg.).)

local agencies, and now the adoption of affirmative action programs can only be accomplished via amendment of the state Constitution. Thus, the political mechanisms for seeking race- and sex-conscious legislation have been "modified to place effective decisionmaking authority over [such legislation] at a different level of government." (*Seattle, supra*, 458 U.S. at p. 474.) On the other hand, the City may continue to grant contracting preferences on other bases (see, e.g., S.F. Admin. Code, ch. 6, § 6.4; *id.*, ch. 14A), and those seeking preferential legislation not involving race or sex continue to have the opportunity to lobby local governmental entities and the Legislature for the expansion of such preferences or the creation of new ones.

That section 31's placement in the state Constitution erects a new and formidable barrier to those advocating for race- and sex-conscious affirmative action programs can hardly be doubted. Amending California's Constitution can be accomplished via either of two methods, both of which impose heavy burdens. First, the state Constitution can be amended via passage of another initiative. (Cal. Const., art. II, § 8.) To qualify a ballot measure, sponsors would initially have to obtain signatures equal to 8 percent of the previous gubernatorial vote. (*Ibid.*) To put that in context, to qualify an initiative constitutional amendment for the 2010 ballot, sponsors would have had to collect 694,354 *valid* signatures. (Cal. Sect. of State, Initiative Guide (2010) <http://www.sos.ca.gov/elections/ballot-measures/how-to-qualify-an-initiative.htm> [as of Aug. 2, 2010].) Because a number of signatures tend to be disqualified, approximately 50 percent more "raw" signatures than the threshold amount must be collected (*Coalition I, supra*, 946 F.Supp. at p. 1498), and they must be obtained within a 150-day period (Elec. Code, § 336).[22] If enough valid signatures are gathered, the initiative is placed on the ballot at the next statewide election and must obtain the approval of a majority of voters. (Cal. Const., art. II, § 8.)

As a second method, the Legislature can amend the state Constitution by securing a two-thirds vote of approval of a proposed amendment by both houses. (Cal. Const., art. XVIII, § 1.) If the Legislature does so, the measure is placed on the ballot and must garner a majority of votes. (*Id.*, § 4.)

If sponsors are able to successfully navigate getting the proposed amendment on the ballot via either process, substantial funds will then be required to run a statewide campaign. (*Coalition I, supra*, 946 F.Supp. at p. 1499.) Because of the size of California, such campaigns tend to be very expensive—as of October 1996, for example, the campaign in support of Proposition 209 had spent $3.1 million. (*Coalition I*, at p. 1499.) As a more recent

---

[22] To collect 150 percent of the threshold number, a measure's sponsors would have to collect 1,041,531 signatures. Given a 150-day window, approximately 7,000 signatures would have to be collected on average per day.

example, in the November 2008 election, $75 million was spent in support of and against Proposition 8, the initiative to ban same-sex marriage. (McKinley & Goodstein, *Bans in 3 States on Gay Marriage*, N.Y. Times (Nov. 6, 2008) p. A20.)[23]

In light of the substantial hurdles that racial minorities and women (and only those individuals) must overcome in seeking remedial legislation, section 31's ban on constitutionally permissible race- and sex-conscious measures impermissibly reallocates power.[24] It "removes the authority to address [race- and sex-conscious beneficial legislation]—and only [such legislation]—from the existing decisionmaking body, in such a way as to burden minority interests." (*Seattle, supra,* 458 U.S. at p. 474.) In the wake of Proposition 209, veterans, the economically disadvantaged, the physically disabled, children of alumni, in-state residents, etc., all may continue to seek, obtain, and benefit from preferential legislation as before.[25] That is, they can approach and lobby their school board, city council, county government, state university, state legislator, or any other public entity to enact legislation or adopt policies. The same is no longer true for those seeking race- and sex-conscious legislation, *even when the legislation is narrowly tailored to remedy the effects of past discrimination by a public entity*. Thus, the practical effect of section 31 is to restructure the political process in a nonneutral fashion. (*Seattle,* at pp. 479–480.)[26]

Although I conclude that section 31's ban of race- and sex-conscious affirmative action violates the political structure doctrine, this does not mean that, once adopted, affirmative action measures may never be abolished. As the Supreme Court has repeatedly explained, the doctrine is not violated when enacting governmental entities merely overturn previous policies or

---

[23] Even in the case of a comparatively less controversial November 2008 ballot measure, like Proposition 2 (Standards for Confining Farm Animals), the statewide campaigns in favor and against the initiative spent over $19 million. (Cal. Sect. of State, Cal-Access Web site, Campaign Finance Activity <http://cal-access.ss.ca.gov/Campaign/Measures/Detail.aspx?id=1301652> [as of Aug. 2, 2010].)

[24] That racial minorities and women can also seek beneficial legislation on all other bases (e.g., a local, minority-owned business can seek preferences available to all locally owned businesses) does not alter this conclusion—the same was true in *Hunter* and *Seattle*.

[25] The concurring opinion places great weight on the fact section 31 applies to public employment *and* education *and* contracting, arguing that the broad scope of section 31 distinguishes it from the laws at issue in *Hunter and Seattle*. (Conc. opn. of Corrigan, J., *ante*, at p. 340.) I disagree. As Judge Norris noted, "Neither *Hunter* nor *Seattle*—nor common sense, for that matter—supports the proposition that *expanding* the levels at which the State disadvantages minorities will render that action any less constitutionally suspect." (*Coalition II, supra,* 122 F.3d at p. 715 (opn. of Norris, J. on den. rehg.).)

[26] Neither the majority nor the concurrence disputes that section 31 puts unique hurdles in front of those who would seek the future enactment of race- and sex-conscious preferential legislation as opposed to those who seek preferential legislation on all other bases.

when voters simply repeal unpopular legislation at the ballot box. (*Seattle, supra*, 458 U.S. at p. 483; *Hunter, supra*, 393 U.S. at p. 390, fn. 5.)[27] Section 31, however, works more than a mere repeal of beneficial legislation by the enacting entity. (*Seattle*, at p. 483.) It burdens all *future* attempts to obtain race- and sex-conscious remedies by relocating decisionmaking power over such legislation from the public entities that had previously wielded it to a remote level of government, the state Constitution. (*Seattle*, at p. 483.)[28]

Significantly, section 31's most profound impact is felt in communities where affirmative action does not arouse substantial opposition. (*Seattle, supra*, 458 U.S. at p. 483; *Hunter, supra*, 393 U.S. at pp. 395–396 (conc. opn. of Harlan, J.).) Where a public entity's decision to enact affirmative action would be unpopular, voters could have simply overturned the policy via referendum or election of new representatives—in such instances, section 31's impact is slight. Where affirmative action is relatively uncontroversial, however, section 31's alteration of the process for enacting future legislation "imposes direct and undeniable burdens on minority interests. 'If a governmental institution is to be fair, one group cannot always be expected to win,' [citation]; by the same token, one group cannot be subjected to a debilitating and often insurmountable disadvantage." (*Seattle*, at p. 484.)[29]

The majority does not contest that section 31 was enacted because of its effect on race- and sex-conscious affirmative action or that, as a result, section 31's impact falls primarily on minorities. Nor does it dispute that section 31 works more than a mere repeal, but rather imposes significant burdens on future efforts to enact race- and sex-conscious preferential legislation. These facts, I submit, establish a clear violation of the political structure doctrine and require, under controlling United States Supreme Court precedent, invalidation of section 31. The majority concludes otherwise. Its main—indeed its only—argument is that the doctrine does not apply when race- and sex-conscious preferential legislation is at issue. (Maj. opn., *ante*, at

---

[27] For example, Governor Pete Wilson issued an executive order on June 1, 1995, repealing race- and gender-conscious employment practices under his immediate control. (Governor's Exec. Order No. W-124-95 (June 1, 1995).) Similarly, on July 20, 1995, the Regents of the University of California acted of their own accord to discontinue the use of race and gender preferences in contracting, employment, and admissions decisions. (Regents of U.C. (Regents), Res. No. SP-1 [admissions]; Regents, Res. No. SP-2 [contracting and employment].) While both of these pre-Proposition 209 decisions resulted in the elimination of race- and sex-conscious preferences, they simply reflected the operation of the normal political process.

[28] For example, while the Regents subsequently decided to rescind resolutions Nos. SP-1 and SP-2 (Policy on Future Admissions, Employment, and Contracting (May 16, 2001)), the policy reversal is essentially without effect in light of section 31.

[29] In San Francisco, for example, 70.5 percent of the electorate opposed Proposition 209. (*Coalition I, supra*, 946 F.Supp. at p. 1507.)

pp. 330–332.)[30] As this distinction finds no support in *Hunter* or *Seattle*, however attractive the majority's holding might be to some as a matter of policy, it is incorrect as a matter of law. In reaching its conclusion, the majority misreads and misapplies the high court's political structure doctrine cases, imposing requirements and finding exceptions that do not appear in, and are not supported by, *Hunter* or *Seattle*.

The majority contends the legislation invalidated in *Hunter* and *Seattle* is distinguishable from section 31 in that the former "obstruct[ed] equal treatment" while the latter "ban[s] preferences." (Maj. opn., *ante*, at p. 330.) In response to the City's argument that race-conscious preferences are as much " 'beneficial legislation' "—the phrase used by the *Seattle* court—as the antidiscrimination ordinance in *Hunter* or the race-conscious busing policy in *Seattle*, the majority declares: "We do not think, however, that the term 'beneficial legislation' can bear the weight the City would place upon it." (Maj. opn., *ante*, at p. 330.)[31] The majority's rejoinder is curious; it is difficult to see how race-conscious preferential legislation does not constitute "beneficial legislation" (*Seattle, supra*, 458 U.S. at p. 467) or "legislation that is in [minorities'] interest" (*Hunter, supra*, 393 U.S. at p. 395 (conc. opn. of Harlan, J.)). It is more reasonable to assume the high court understood that "beneficial legislation" is an expansive phrase and used it *intending it be so construed*. The majority points to nothing in either *Hunter* or *Seattle* to suggest the Supreme Court intended the cramped reading the majority now adopts. To the contrary, there is substantial evidence in those opinions supporting the notion that the high court *did* intend for its language to be read broadly.

For example, the high court discussed minorities' ability "to enact legislation in [their] behalf" (*Hunter, supra*, 393 U.S. at p. 393); "the ability of minority groups to achieve beneficial legislation" (*Seattle, supra*, 458 U.S. at p. 467); minorities' ability " 'to achieve favorable legislation' " (*id.* at p. 470,

[30] The majority relies on decisions of the Ninth and Sixth Circuit Courts of Appeals (*Coalition to Defend Affirmative Action v. Granholm* (6th Cir. 2006) 473 F.3d 237; *Coalition II, supra*, 122 F.3d 692). (Maj. opn., *ante*, at pp. 327, 330, 332.) As the majority acknowledges (*id.* at pp. 329–330), however, while decisions of lower federal courts on questions of federal law are persuasive, they do not bind us; rather, we make an independent determination of federal law. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58 [51 Cal.Rptr.3d 55, 146 P.3d 510]; see, e.g., *Steffel v. Thompson* (1974) 415 U.S. 452, 482, fn. 3 [39 L.Ed.2d 505, 94 S.Ct. 1209] (conc. opn. of Rehnquist, J.).)

[31] To the extent the majority opinion can be read to imply the Supreme Court could not have anticipated that the phrase "beneficial legislation" might be read to include race-conscious affirmative action (maj. opn., *ante*, at pp. 330–332), I disagree. Executive orders promulgated by Presidents Kennedy (Exec. Order No. 10925, 26 Fed.Reg. 1977 (Mar. 6, 1961)) and Johnson (Exec. Order No. 11246, 30 Fed.Reg. 12319 (Sept. 28, 1965)) required the use of affirmative action to combat discrimination. At a minimum, by the time *Seattle* was decided in 1982, the notion of race- and sex-conscious affirmative action was very well understood.

citing *Hunter*, at p. 394 (conc. opn. of Harlan, J.)); the ability "to achieve legislation that is in [minorities'] interest" (*Hunter*, at p. 395 (conc. opn. of Harlan, J.)); the "burden [on] minority interests" (*Seattle*, at pp. 474, 484); the "political achievement of minority interests" (*id.* at p. 475, fn. 17); and "the ability of racial groups to enact legislation specifically designed to overcome the 'special condition' of prejudice" (*id.* at p. 486). That the Supreme Court repeatedly spoke in expansive terms bolsters the City's argument—the political structure doctrine is concerned not with minorities' actual legislative goals, but with their equal and meaningful access to the political process. (See, *ante*, at p. 346.)[32] The majority's reliance on the preferential nature of the legislation is therefore an inapt basis for distinguishing *Hunter* and *Seattle*.

Moreover, the majority's efforts to distinguish "between initiatives obstructing equal treatment and initiatives banning preferences" (maj. opn., *ante*, at p. 330) elides the fact that section 31's only practical effect is on the narrow group of laws that can survive heightened constitutional scrutiny. (See, *ante*, at p. 335.) Given that reality, the distinction between the race-conscious affirmative action here and the antidiscrimination law in *Hunter, supra*, 393 U.S. at page 386, is illusory.[33] Before adopting race-conscious preferential legislation, a public entity must document in some detail the existence of discrimination to provide "a 'strong basis in evidence . . . that remedial action [is] necessary.' [Citation.]" (*Croson, supra*, 488 U.S. at p. 500.) Thus, the 2003 ordinance at issue here is in a very direct way an antidiscrimination program, in which any preference granted must be strongly justified by the tangible continuing effects of the City's own past discrimination. To withdraw from public entities the ability to engage in this kind of racial antidiscrimination program, and to withdraw from minorities the capacity to advocate for such local antidiscrimination legislation in the future, while at the same time permitting local entities to grant preferences for other groups (without having to make a similar showing of discrimination), is precisely the kind of selective political restructuring that *Hunter* and *Seattle* sought to forbid.

---

[32] The majority goes astray by wrongly focusing on the difference between race-conscious preferences on the one hand and the *Hunter* housing ordinance and the *Seattle* busing policy on the other hand. (Maj. opn., *ante*, at pp. 330–332.) The focus should instead be on the erected legislative hurdles: section 31, the *Hunter* charter amendment, and the *Seattle* statewide initiative. All three similarly burdened minorities' equal and meaningful access to the political process, undermining their ability to achieve favorable legislation in a nonneutral fashion.

[33] The difference between constitutionally permissible affirmative action and the race-conscious busing addressing de facto segregation in *Seattle* is even less clear. Moreover, as regarding the political structure doctrine, the Supreme Court necessarily rejected any distinction between the antidiscrimination law in *Hunter* and the race-based remedial efforts in *Seattle*.

As an additional rationale for distinguishing section 31, the majority cites two related arguments made by the Ninth Circuit. The first argument is that the Constitution does not require race-conscious measures "it barely permits." (*Coalition II, supra,* 122 F.3d at p. 709; see maj. opn., *ante,* at pp. 327–328.) This, of course, is a red herring. No one contends the Constitution requires race- or sex-conscious affirmative action. Nor is that relevant to the inquiry, as neither the adoption of the housing ordinance in *Hunter* nor the busing policy in *Seattle* was constitutionally required. Rather, the focus of the political structure doctrine is on nonneutral structural obstacles to constitutionally permitted, not required, legislation in minorities' interest. "What the Court did hold is that states may not place political obstacles in the way of laws that favor minorities, nor may they remove such laws wholesale from the political process. All that is constitutionally required is that minorities have the *opportunity,* on equal terms, to seek 'legislation in [their] behalf' within existing channels of government. [Citation.]" (*Coalition II,* at p. 715 (opn. of Norris, J., on den. rehg.).)

Second, the majority suggests that section 31 cannot violate the Constitution, as it is consistent with the " 'core purpose' of the equal protection clause." (Maj. opn., *ante,* at p. 332.) The Ninth Circuit put it more lyrically: " '[I]t would be paradoxical to conclude that by adopting the Equal Protection Clause of the Fourteenth Amendment, the voters of the State thereby had violated it.' (*Crawford,* [*supra,*] 458 U.S. at [p.] 535.)" (*Coalition II, supra,* 122 F.3d at p. 709, fn. omitted.) This is a canard. Section 31 is *not* coextensive with the equal protection clause. While it is true that the Constitution permits race- and sex-conscious measures only if they can survive heightened scrutiny, section 31 goes further. As the Attorney General puts it, "[section 31] closes a door to race- and gender-conscious programs that the Fourteenth Amendment leaves open." And it does so while simultaneously leaving others free to seek preferential legislation on all other bases. This unique burden on the ability of women and racial minorities to achieve beneficial legislation in their interest is what violates the political structure doctrine, and thus the Constitution. (*Hunter, supra,* 393 U.S. at pp. 390–391.)[34]

Finally, while the majority disclaims the argument (maj. opn., *ante,* at p. 332, fn. 10), it bears noting that *Coalition II* questioned the vitality of the political structure doctrine in light of recent decisions by the high court. (*Coalition II, supra,* 122 F.3d at pp. 704, 705, fn. 13; see also conc. opn. of

---

[34] As one commentator aptly put it, "[i]f the Equal Protection Clause does not prohibit the race and gender preferences barred by Proposition 209, compliance with the Equal Protection Clause cannot constitute a justification for Proposition 209's discriminatory invalidation of race and gender preferences." (Spann, *Proposition 209* (1997) 47 Duke L.J. 187, 255.)

Corrigan, J., *ante*, at p. 344.)[35] I do not perceive the same irreconcilability and am not convinced the Supreme Court's more recent conventional equal protection decisions undermine *Hunter* and *Seattle*. (See Amar & Caminker, *supra*, 23 Hastings Const. L.Q. at pp. 1035–1039.) Whereas more recent Supreme Court cases have restricted the type of affirmative action remedies permitted under the Constitution, they do not undermine the principle that minorities may not be prevented, via nonneutral political restructuring, from seeking beneficial legislation—including constitutionally permissible affirmative action remedies.

Moreover, as noted before, our task is to faithfully apply the Supreme Court's precedent, not to prognosticate what the court might do if presented with the opportunity to reconsider the doctrine. "If a precedent of [the high court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the high court] the prerogative of overruling its own decisions." (*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, *supra*, 490 U.S. at p. 484.)[36]

Thus, applying the Supreme Court's decisions in *Hunter* and *Seattle*, I conclude section 31's ban on constitutionally permissible race- and gender-conscious remedial measures violates the political structure doctrine, and I would remand the case for consideration of whether section 31 can withstand heightened scrutiny. In so concluding, I fully acknowledge the controversial nature of race- and sex-conscious measures (even when undertaken to remedy past discrimination) and the considerable passions on both sides of the issue. However, as Judge Henderson wisely commented in *Coalition I*, *supra*, 946 F.Supp. at page 1490, "this case does not call upon this Court to adjudicate whether affirmative action is right or wrong, or whether it is no longer an appropriate policy for addressing the continuing effects of past and present discrimination against racial minorities and women. Such questions, while

---

[35] Of course, while the majority states it does not question the doctrine's "continuing validity" (maj. opn., *ante*, at p. 332, fn. 10), it nonetheless uses "historical context" (*ibid.*) to justify a cramped reading of the doctrine. (See, *ante*, at pp. 363–364.)

[36] In *Romer v. Evans*, *supra*, 517 U.S. 620, the high court invalidated a state initiative prohibiting public entities from taking actions to protect gays and lesbians. The state supreme court concluded the measure was subject to strict scrutiny, relying on the political structure doctrine. (*Id.* at pp. 625–626.) The Supreme Court affirmed the judgment, but based its decision on a conventional equal protection analysis. (*Id.* at pp. 633–634.) In dissent, Justice Scalia suggested the majority "implicitly reject[ed]" the state supreme court's political structure doctrine holding. (*Id.* at p. 640, fn. 1 (dis. opn. of Scalia, J.).) I respectfully disagree. To the contrary, Justice Kennedy's majority opinion is fully consistent with the underpinnings of the political structure doctrine. (See *id.* at p. 633.) Moreover, contrary to the concurrence's suggestion (conc. opn. of Corrigan, J., *ante*, at p. 343, fn. 3), the applicability of the doctrine in *Romer* was not so plain. Rather, the invalidated initiative in *Romer* explicitly targeted and burdened gays and lesbians. Thus, a conventional equal protection analysis was called for.

they are most certainly of vital public policy interest, lie beyond the purview of this Court. . . . [¶] Rather, the substantive issues raised by this action are considerably more narrow, albeit no less important: whether the particular *method* chosen by Proposition 209 to curtail affirmative action is unlawful because it . . . violates the rights of women and minorities to fully participate in our political system . . . ." As I conclude the answer is yes, I dissent from the majority's contrary view.

## III.

The City argues it can demonstrate triable issues exist regarding whether it was constitutionally *obliged* to enact the 2003 ordinance, given ample evidence of pervasive intentional discrimination in the awarding of public contracts; that is, that the ordinance may be the only, or at least the most likely, means of remedying purposeful racial discrimination. As the majority explains, the trial court failed to meaningfully address this argument and remanding for a hearing would be helpful to reviewing courts. (Maj. opn., *ante*, at pp. 335–336.) I fully concur.

I also fully agree with the majority that the board of supervisor's legislative findings "do not bind the court on remand" and that, where racial classifications are at issue, " 'simple legislative assurances of good intention cannot suffice' [(*Croson*, *supra*, 488 U.S. at p. 500)]." (Maj. opn., *ante*, at p. 338, fn. 20.) When, however, as in the present case, remedial measures rest not on such "simple legislative assurances," but on detailed factual findings, respect for constitutional separation of powers requires they be given considerable weight. (*Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 814 [98 Cal.Rptr.2d 221, 3 P.3d 868].)

To recap, before adopting the 1989 version of the ordinance, the City considered the testimony of 42 witnesses and the written submissions from 127 minority, women, local, and other business representatives. The City subsequently held another 10 public hearings, commissioned two statistical studies, and sought additional written submissions from the public.

When the 1989 ordinance expired and the City was considering adopting a new version, it held an additional 14 public hearings, considered the live testimony of 254 witnesses, videotaped testimony of numerous other witnesses, additional statistical disparity studies, and other documentary evidence pertinent to alleged discrimination and bidding irregularities. The City also heard direct evidence concerning racial discrimination by City employees.

When the 1998 ordinance expired and the City was considering adopting the version of the ordinance challenged here, it conducted additional public

hearings at which 134 individuals testified. It heard additional direct evidence of ongoing discrimination in the contracting process and also heard evidence that prime contractors tried to circumvent compliance with the ordinance. An additional disparity analysis was conducted, and the City's Human Rights Commission wrote a report containing additional examples of discrimination in the process. Only after these efforts were completed did the board of supervisors make extensive legislative findings, including that the paucity of City contracts going to minority- and women-owned businesses was due to discrimination by the City and discrimination in the private sector, that the City was actively discriminating against women and minority groups in its contracting and passively participating in private sector discrimination, that the City's contracting practices were in violation of federal law, and that the ordinance was required to remedy the discrimination against minority- and women-owned businesses.

As Justice Kennedy noted in *Croson*, "evidence which would support a judicial finding of intentional discrimination may suffice also to justify remedial legislative action, *for it diminishes the constitutional responsibilities of the political branches to say they must wait to act until ordered to do so by a court*." (*Croson*, *supra*, 488 U.S. at p. 519 (conc. opn. of Kennedy, J.), italics added.) Questions such as whether "a race- and gender-conscious remedy is . . . the most likely . . . means of rectifying" injury from past discrimination (maj. opn., *ante*, at pp. 337–338) require an assessment of complex historical and socioeconomic data, and a government entity's answer to such questions, if methodologically sound and supported by substantial evidence, should not be lightly overturned by a reviewing court.

## IV.

The City also argues the ordinance is required to maintain the eligibility for funding it receives from various federal agencies, including the United States Department of Transportation. If the City is correct, the ordinance is unquestionably exempt from section 31.[37] The majority rejects the City's argument and affirms the granting of plaintiffs' summary judgment motion. (Maj. opn., *ante*, at pp. 333–335.) I disagree and would remand for further proceedings.

As the majority explains (maj. opn., *ante*, at p. 333), title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

---

[37] Section 31, subdivision (e) exempts actions "which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State."

discrimination under any program or activity receiving Federal financial assistance." Title VI also authorizes federal agencies that provide funding to issue regulations implementing its requirements. (42 U.S.C. § 2000d-1.) To that end, the Department of Transportation issued a regulation providing that, "Where prior discriminatory practice or usage tends, on the grounds of race . . . to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . , the applicant or recipient must take *affirmative action* to remove or overcome the effects of the prior discriminatory practice or usage. Even in the absence of prior discriminatory practice or usage, a recipient . . . is expected to take *affirmative action* to assure that no person is excluded from participation in or denied the benefits of the program or activity on the grounds of race . . . ." (49 C.F.R. § 21.5(b)(7) (2009), italics added.) The regulation further makes clear that race-conscious measures do not constitute prohibited discrimination "if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity . . . ." (*Ibid.*)

The majority concludes that the Department of Transportation regulation permits, but does not require, funding recipients to use race-conscious measures to remedy past discrimination, as "affirmative action," as that term is meant in the regulation, encompasses both race-conscious and race-neutral measures. (Maj. opn., *ante*, at pp. 334–335.) Thus, the majority reasons, a recipient can remain eligible for federal funding *and* comply with section 31 by using *race-neutral* affirmative action to address racial discrimination. (*Id.* at p. 335.) I fully agree in most instances.

The majority, however, fails to grapple with what happens if race-neutral affirmative action is incapable of remedying the discrimination. For example, we have recognized that, "Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy *necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury.* [Citations.]" (*Hi-Voltage, supra,* 24 Cal.4th at p. 568, italics added.) Indeed, the majority has concluded the City should have the opportunity to show whether triable issues of fact exist as to whether the Constitution requires adoption of the ordinance because, among other things, "a race- and gender-conscious remedy is necessary as the only, or at least the most likely, means of rectifying the [discrimination.]" (Maj. opn., *ante*, at pp. 335, 337–338.)[38] If the City is successful in so demonstrating, it would be

---

[38] The majority states that its resolution of this claim would be unaffected were the City to demonstrate the existence of purposeful discrimination on remand. (Maj. opn., *ante,* at p. 333, fn. 14.) It reasons that, if the ordinance is *required* by the equal protection clause, the City's federal funding claim "has no practical significance." (*Ibid.*) Even assuming the majority is correct on this point, if the ordinance is only permitted, and not required, under the

incongruous to conclude that the Constitution requires a race-conscious remedy (because, in part, of the inadequacy of race-neutral measures) but that the Department of Transportation's regulations do not.[39]

Thus, in light of our decision to remand the matter for further consideration of the federal compulsion issue, I would also remand this claim so the superior court can consider if the City can show triable issues of fact exist as to whether it is required to take race-conscious affirmative action to maintain its funding eligibility because race-neutral measures are inadequate.

## V.

Accordingly, I dissent from parts II.A. and II.B. of the majority's opinion. I concur with part II.C. of the majority's opinion and with its decision to remand the matter for further proceedings.

---

equal protection clause, the City should have the opportunity to demonstrate race-neutral measures will not suffice to comply with its obligations under federal regulations.

[39] Funding recipients cannot reasonably be required to employ ineffective race-neutral measures, nor, indeed, would it appear that the use of fruitless measures would satisfy entities' obligations under title VI and agencies' implementing regulations.